[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 8, 2004
THOMAS K. KAHN
CLERK

_____

No. 04-10272

_____

D. C. Docket No. 99-02364CV-JOF-1

RODERIC R. McDOWELL,

Plaintiff-Appellant,

versus

PERNELL BROWN, JOHN DOE, No. 1
WEXFORD HEALTH SOURCES, INC., et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(December 8, 2004)**

Before EDMONDSON, Chief Judge, FAY, Circuit Judge, and CORRIGAN *, District
Judge.

FAY, Circuit Judge:

_____
* Honorable Timothy J. Corrigan, United States District Judge for the Middle District of Florida,
sitting by designation.

This litigation involves claims asserted by Roderic McDowell against government and medical defendants resulting from the delayed treatment of his illness while detained as an inmate at Dekalb County Jail in June 1997. The district court granted summary judgment in favor of Dekalb County, Georgia, on Mr. McDowell's § 1983 claims. The district court also granted summary judgment to defendants Wexford Health Sources, Inc., and Pernell Brown on his state law medical negligence claims. No other claims were left pending before the district court. Mr. McDowell's appeal raises the following issues: (1) whether Mr. McDowell demonstrated a § 1983 claim against a municipality under Board of County Commissioners v. Brown, 520 U.S. 397 (1997); and (2) whether the district court erred in excluding all of Mr. McDowell's expert witnesses, which resulted in the dismissal of the claims against Wexford and Brown. We answer both questions in the negative, and affirm the district court's grant of summary judgments in favor of the defendants.

## I. Facts

The Dekalb County Sheriff's Office maintains the Dekalb County Jail (the "Jail"). This appeal involves two divisions at the Jail: the jail division, which manages the daily operations, and the field division, which handles medical transports to Grady Memorial Hospital ("Grady"). Additionally, the Jail contracted its health

2

services out to Wexford Health Sources, Inc. ("Wexford"). Wexford, in turn, employed doctors and nurses to attend to the inmates' medical needs. The Jail's policy required its staff to call an Emergency Medical Services ambulance should medical personnel determine an inmate's condition to be an emergency.

Plaintiff, Roderic McDowell, was detained as an inmate at the Dekalb County Jail in May and June 1997 pending disposition of a warrant for failure to report to his probation officer. Two weeks into his detention, at the end of May 1997, Mr. McDowell began to suffer pain in his lower back. Over the course of several days, Wexford's nurses treated Mr. McDowell's condition. On June 5, 1997, the Jail's field division transported Mr. McDowell to Grady to evaluate his back pain and other symptoms. Mr. McDowell was treated and returned to Grady the same day.

At 9:30 p.m. the following day, June 6, 1997, Mr. McDowell reported that he could not urinate and had difficulty walking. Pernell Brown ("Nurse Brown"), a Wexford nurse in the Jail's medical clinic, examined Mr. McDowell, and determined that he needed to return to Grady for treatment. Nurse Brown completed a referral form directing the Jail to send Mr. McDowell to Grady in order to rule out pneumonia or "acute abdomen." At 9:50 p.m., Nurse Brown gave the referral form to Sergeant Hutchinson with the Sheriff's Office. There is some dispute as to whether Nurse Brown informed Sergeant Hutchinson of either the urgency of Mr. McDowell's

3

condition or the time frame in which Mr. McDowell needed medical attention. Sergeant Hutchinson testified during his deposition that Nurse Brown gave no such instructions, while Nurse Brown maintained in her deposition that she told Sergeant Hutchinson to transport Mr. McDowell to Grady "within the hour." Nurse Brown did not inform the Wexford doctor on call of the situation, and left the Jail shortly after seeing Mr. McDowell.

Sergeant Hutchinson and another officer moved Mr. McDowell from the Jail's clinic to its intake area to await transport by field division officers because the transport area was closed. Sergeant Hutchinson then distributed copies of Mr. McDowell's referral form to various Sheriff's Office staff, communications personnel, and the intake area nurse. The communications officer reported that dispatch had sent a field division unit to handle Mr. McDowell's transport to Grady. At the end of his shift, Sergeant Hutchinson informed the following shift's supervisor that Mr. McDowell was waiting in the intake area for transport to Grady by the field division.

A nurse monitored Mr. McDowell's condition while he waited in the intake area, and provided care for his infirmities. When a field division deputy arrived, another inmate, suffering severe facial trauma from an altercation, also required transport to Grady. The transport deputy could only take one inmate because policy

4

mandated that the deputy wait with the inmate at Grady. The deputy consulted the intake nurse and took the other inmate to Grady. Jail staff then took Mr. McDowell back to the medical clinic so he could lie down, and to allow Wexford nurses to monitor his condition and arrange for ambulance transport if Mr. McDowell's condition deteriorated.

In the early morning hours of June 7, 1997, the field division performed several mental health transports. Mr. McDowell's condition was not considered an emergency, and the Jail's policy places priority on mental health transports over non-emergency transports. The morning watch commander notified the Jail that his shift could not transport Mr. McDowell to the hospital; Mr. McDowell's transport would be accomplished by the day shift, which began at 8:00 a.m. When the day watch deputy arrived to take Mr. McDowell to Grady, he was no longer in the intake area. The field division sergeant told the Jail to inform him when Mr. McDowell was ready for transport. At 9:00 a.m. that morning, Mr. McDowell told an officer that he had no feeling in his legs. A doctor and nurse examined Mr. McDowell and determined his condition to be emergent. An ambulance was called to take Mr. McDowell to Grady. He arrived there at 12:20 p.m.

By the time he arrived at Grady Hospital, Mr. McDowell was experiencing paralysis in his legs. Mr. McDowell was first examined by Grady doctors at 1:38 p.m.

5

One doctor noted Mr. McDowell's symptoms and diagnosed him as needing to "rule out" spinal cord compression and epidural abscess. For the rest of the day, a battery of tests were performed on Mr. McDowell. By 6:45 p.m., doctors diagnosed Mr. McDowell with spinal cord compression, and transferred him back to the emergency room at 9:20 p.m. Emergency physicians then admitted Mr. McDowell to the neurosurgical department. Mr. McDowell entered surgery for a spinal epidural abscess[1] at approximately 10:20 p.m., more than twenty-four hours after he first visited Nurse Brown. The surgery ultimately reversed Mr. McDowell's total paralysis, however, Mr. McDowell remains an incomplete paraplegic.[2]

## II.  Proceedings Below

Mr. McDowell filed this case in Georgia state court on June 1, 1999, alleging medical malpractice and constitutional violations against: Dekalb County (the "County" or "Dekalb"), Wexford and Nurse Brown,[3] Grady Memorial Hospital, and several doctors and nurses who treated Mr. McDowell at Grady. Mr. McDowell sued Dekalb under 42 U.S.C. § 1983 for violation of his Eighth Amendment rights and

---

[1]A spinal epidural abscess is a pocket or collection of pus which develops in or around the epidural space in the spinal cord.

[2]Mr. McDowell needs assistance to walk, but can expel without catheterization.

[3]The medical malpractice claims against Wexford were based on respondeat superior liability for the negligence of Wexford's nurses, including Nurse Brown.

asserted state-law medical negligence claims against Wexford and Grady.[4] The County removed the case to federal district court on September 16, 1999.

On September 25, 2001, the district court determined that McDowell failed to establish that the County's policy, practice or custom resulted in the violation of his Eighth Amendment rights, as required by Monell v. Department of Social Services, 436 U.S. 658 (1978). Consequently, the district court granted the County's motion for summary judgment.[5] On the same date, the Grady defendants sought to exclude the testimony of McDowell's medical experts, Drs. James Merikangas, M.D. ("Dr. Merikangas"), Rabih O. Darouiche. M.D. ("Dr. Darouiche"), and David Gower, M.D. ("Dr. "Gower"). Wexford did not join Grady's motion, and on September 30, 2002, the district court granted Grady's motion and excluded all of McDowell's experts .[6]

In March 2003, with the case against the County dismissed, the district court re-opened discovery to permit McDowell to develop further expert testimony on

---

[4]Mr. McDowell also asserted a § 1983 claim against Wexford, but later dismissed that claim.

[5]Pursuant to Federal Rule of Civil Procedure 54(b), McDowell requested a certification from the district court, that its ruling was a final judgment with respect to Dekalb. The district court denied that motion.

[6]Neither McDowell nor Wexford briefed the admissibility of the experts' testimony with regard to Wexford's negligence. In granting Grady's motion, the district court explained that it only considered the question of whether the expert testimony was admissible as it pertained to the "doctor Defendants." The district court noted, however, that the experts did state that they were not qualified to render an opinion as to the nurses' standard of care.

causation, but it did not permit additional expert discovery with regard to Nurse Brown's negligence. As a result of the district court's prior exclusion of McDowell's medical experts and its determination that they could not testify as to the proper standard of care for a nurse, McDowell was left with no expert testimony regarding the standard of care or causation with respect to Wexford. Therefore, the district court granted summary judgment in favor of Wexford on March 23, 2003.

McDowell's case proceeded against the Grady Defendants, eventually reaching a settlement in August 2003. McDowell dismissed his claims against the individual Grady nurses and doctors and against Grady itself. As such, none of the Grady Defendants are part of this appeal. Therefore, the claims pertinent to this appeal concern the § 1983 claim against the County, and the state law medical negligence claims against Wexford. McDowell challenges the district court's grant of summary judgment to the County, and the exclusion of his medical experts against Wexford. We will address each issue as it pertains to the particular defendant in turn.

### III. Summary Judgment for Dekalb County

We review a district court's grant of summary judgment to DeKalb County de novo, and apply the same legal standards used by the district court. See O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir.2001). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving

party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A district court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." See Nolen v. Boca Raton Cmty. Hosp., Inc., 373 F.3d 1151, 1154 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to judgment as a matter of law under that version of the facts. Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir.2003). If the evidence could not lead a rational fact-finder to find for the nonmoving party, and where the nonmoving party fails to make a sufficient showing to demonstrate an element essential to that party's case, on which that party bears the burden of proof at trial, then no genuine of issue material fact exists, and summary judgment should be granted. Celotex, 477 U.S. at 322-23; see Holbrook v. City of Alpharetta, 112 F.3d 1522, 1525-26 (11th Cir. 1997). Finally, genuine disputes are "those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996).

9

Mr. McDowell argues that Dekalb County's custom of understaffing the Sheriff's Office (and the Jail) delayed the treatment of his condition and thereby violated his rights under the Eighth Amendment. Title 42 U.S. § 1983 provides that:

> Every person who, under the color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Although the Supreme Court has held that counties (and other local government entities) are "persons" within the scope of § 1983, and subject to liability, McDowell cannot rely upon the theory of <u>respondeat</u> <u>superior</u> to hold the County liable.[7] <u>See</u> <u>Monell v. Dept. of Soc. Servs.</u>, 436 U.S. 658, 692 (1978) (finding that § 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"); <u>Pembaur v. Cincinatti</u>, 475 U.S. 469, 479 (1986). "It is only when the 'execution of the government's policy or custom...inflects the injury' that the municipality may be held

---

[7]Mr. McDowell conceded that the sheriff's deputies he named in his suit were entitled to qualified immunity in their individual capacities. The district court, therefore, only assessed the liability of Dekalb County resulting from deputies acting in their official capacities. <u>See</u> <u>Pompey v. Broward County</u>. 95 F.3d 1543, 1545-46 n.2 (resolving official capacity claims as those against a county).

liable." City of Canton v. Harris, 489 U.S. 378, 385 (1989). A county does not incur § 1983 liability for injuries caused solely by its employees. Monell, 436 U.S. at 694. Nor does the fact that a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee infer municipal culpability and causation. Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997). Instead, to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. See Canton, 489 U.S. at 388.

No party challenges that McDowell had a severe medical condition that required urgent care and treatment, which he did not receive. This resulted in a violation of McDowell's constitutional rights.[8] Our first inquiry, then, is whether Dekalb's policy or custom was to understaff the field division so as deny McDowell's constitutional rights. In Wayne v. Jarvis, 197 F.3d 1098 (11th Cir. 1999), we clarified

---

[8] As a pre-trial detainee, McDowell's rights exist under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment, which McDowell alleges in this case. See City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983). Nonetheless, McDowell's claims are subject to the same Eighth Amendment scrutiny as if they had been. brought as deliberate indifference claims under the Eighth Amendment. See Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994); see also Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir.1985) (holding that "in regard to providing pretrial detainees with such basic necessities as...medical care[,] the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons.").

11

the standard for establishing municipal liability. A plaintiff seeking to hold a municipality liable under § 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Id. at 1105 (quoting Brown, 520 U.S. 397, 403 (1997)). We defined custom as "a practice that is so settled and permanent that it takes on the force of the law. Wayne, 197 F.3d at 1105 (quoting Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) cert. denied, 522 U.S. 1075 (1998). In order for a plaintiff to demonstrate a policy or custom, it is "generally necessary to show a persistent and wide-spread practice." Id. (internal quotations and citations omitted). See also, Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994).

This threshold identification of a custom or policy "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Brown, 520 U.S. 403-04 (citations omitted). This prevents the imposition of liability based upon an isolated incident. See Depew v. City of St. Mary's, 787 F.2d 1496 (11th Cir. 1986) ("Normally, random acts or isolated incidents are insufficient to establish a custom or policy"). Rather, the incident must result from a demonstrated practice. See Wayne, 197 F.3d at 1106 (determining that a single decision, "even if erroneous, would not support the inference that the County had a custom or policy" in place). Based on these instructions, McDowell must establish

12

that DeKalb's policy was to understaff the field division, and that this practice left the division unable to execute medical transports.

The Sheriff and the Sheriff's Office of Dekalb County are responsible for the County's law enforcement functions. The Board of Commissioners of Dekalb County (the "Board") approves the Sheriff's Office budget. To demonstrate the Jail's routine understaffing practices, McDowell points to the testimony of numerous Sheriff's Office employees claiming that the Jail lacked adequate manpower. Indeed, the chief of jail operations, Dennis Cheatham, testified in his deposition that despite Sheriff's Office requests for additional personnel, other priorities often took precedent. Moreover, the Jail's former health services coordinator explained that transporting inmates between the Jail and Grady was a "continual problem," which he "constantly [tried] to correct and amend."

Although McDowell produced evidence that the Jail had staffing problems, the record provides no evidence that the field division consistently failed to transport non-emergency cases to Grady. Additionally, the field division's policy was to call an ambulance to take the inmate to Grady if it could not accomplish the transport itself. While McDowell's case is tragic, he cannot point to another occasion when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition. Simply put, this isolated incident, however

unfortunate, does not demonstrate evidence of the County's "persistent" or "widespread" policy of understaffing the Jail so as to delay the transfer of inmates to Grady.

Our next inquiry requires that a municipality's that the municipality's action was "taken with the requisite degree of culpability...with deliberate indifference to its known or obvious consequences." Davis ex rel. Doe v. DeKalb County Sch. Dist., 233 F.3d 1367, 1375-76 (11th Cir. 2000). McDowell cannot rely on a generalized policy of understaffing. See Anderson v. City of Atlanta, 778 F.2d 678, 687-88 (11th Cir. 1985). The County must have a "deliberate intent" to inadequately staff the field division. Id.

In Brown, the Supreme Court refined the culpability requirement for municipal liability cases. The Court set forth a scheme whereby a governing body's own intentional acts that violate constitutionally protected rights amount to "per se" § 1983 liability. In such cases, where the "municipal action itself violates federal law, or directs an employee to do so...issues of fault and causation [are] straightforward," and "present no difficult questions... ." Id. at 405-06 (examining Owen v. City of Independence, 445 U.S. 622 (1980) (city council discharged an employee without notice), and City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981) (city imposed content-based speech regulation, in violation of the First Amendment);

14

<u>Pembaur</u>, 475 U.S. at 479 (prosecutor was a "final municipal decisionmaker" who directed deputies to illegally enter plaintiff's business)).

At the other end of the § 1983 liability spectrum, is where the plaintiff claims that a municipality's facially valid actions violated his constitutional rights. In such a case, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." <u>Brown</u>, 520 U.S. at 405. As <u>Brown</u> pointed out, "Congress did not intend municipalities to be held liable unless <u>deliberate</u> action attributable to the municipality directly caused a deprivation of federal rights." <u>Id</u>. at 415 (emphasis in the original). To meet this burden, a plaintiff must demonstrate that the lawful action was "taken with 'deliberate indifference' as to its known or obvious consequences." <u>Id</u>. at 407 (quoting <u>Canton</u>, 489 U.S. at 388). Plainly stated, a "showing of simple or even heightened negligence is not enough." <u>Brown</u>, 520 U.S. at 407.

Mr. McDowell traces the County's liability to its failure to properly fund the resources necessary to staff the Jail. The Supreme Court has recognized that inadequate training may impose § 1983 liability on a municipality in "limited circumstances." <u>See Canton</u>, 489 U.S. at 387. The Court, however, refused to extend liability to inadequate hiring practices. <u>See Brown</u>, 520 U.S. at 409. McDowell is asking this Court to extend liability to inadequate budgeting practices, but does not

15

identify any "pattern of injuries" linked to the County's budgetary decisions, nor does he insist that its accounting practices are "defective." Id. at 408. McDowell's claim rests upon one incident, which he attempts to trace back to a single decision; a decision that does not represent a violation of federal law on its face. Our precedent does not permit such an attenuated link. If it did, the "danger that a municipality would be held liable without fault is high." Brown, 520 U.S. at 408. The County's decision impacted this single case; it had no notice of the consequences "based on previous violations of federally protected rights." Id.

McDowell cannot establish that a reasonable member of the Board would conclude that the County's budget decisions would lead to events that occurred here. See Davis, 233 F.3d at 1376. Although the record reflects that several deputies testified that the field division lacked the personnel to move inmates to Grady, no evidence was presented that the County's Board was aware of the health consequences involved. Moreover, the record demonstrated that the field division accomplished non-emergency transfers to Grady within a one-to-two hour window. Finally, the County's policy directed the field division to send all emergency cases to Grady by ambulance, and even non-emergency cases, if transport could not be effected in a timely manner. It was a clear, simple directive that said if you cannot transport with your resources you are to call an ambulance for needed medical

transportation. With such practices in place, McDowell cannot establish or seriously dispute that the Board would anticipate that inmates would not receive timely medical attention. The alleged constitutional violation here was not a "highly predictable consequence" of the County's failure to budget (and hence, adequately staff) the Sheriff's Office. See Brown, 520 U.S. at 409-410.

Our final inquiry examines causation. A plaintiff must prove causation by demonstrating that the municipality's "deliberate conduct...was the 'moving force' behind [his] injury... ." Brown, 520 U.S. at 404 (emphasis in the original). See also Davis, 233 F.3d at 1376-77. Brown noted that "every injury suffered at the hands of a municipal employee can be traced to a hiring decision;" we believe the same holds true for budget decisions. Id. at 410. If we employed such a strict causation analysis, then "but for" the County's budget decision, McDowell would not have suffered the injury. Id. at 410. The Supreme Court warned against such pervasive scrutinty: "To prevent municipal liability for a...decision from collapsing into respondeat superior liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." Id.

We heed the Court's caution and apply it here. While it may be true that the Board's budget decision would make a violation of his constitutional rights "more likely," that alone cannot "give rise to an inference that a policy maker's failure to

17

scrutinize the [budget]...produced a specific constitutional allegation." Brown, 520 U.S. at 411 (emphasis in original). Brown determined that the showing of one incident of inadequate employee screening did not establish "deliberate indifference." Id. Brown further enunciated that a "finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury." Id. At 412. We agree. The County's liability cannot be dependent on the scant likelihood that its budget decisions would trickle down the administrative facets and deprive a person of his constitutional rights. Instead, liability must be premised on a finding that "this" budget decision was "highly likely to inflict the particular injury" McDowell suffered. Id.

To "test the link" between McDowell's injury and the County's conduct, we look to whether a complete review of the budget decision (and the resulting understaffed Jail) reveals that the Board should have known that McDowell's injuries were a "plainly obvious consequence" of that decision. Brown, 520 U.S. 412. We find no such revelation. Even making all reasonable inferences in McDowell's favor, we must agree with the district court that he failed to demonstrate a genuine issue of fact that the County acted with conscious disregard. See Davis, 233 F.3d 1374-75. McDowell did not proffer testimony that members of field division believed they could not perform medical transports because of understaffing. Additionally,

18

McDowell did not demonstrate that the County was the "moving force" behind his injury, given that the Jail was instructed to request an ambulance to transport medical cases to Grady when the field division was unavailable. Brown, 520 U.S. at 404. Finally, the record indicates that the consequences associated with the Jail's failure to transport McDowell to the hospital in a timely fashion never happened before. To hold a municipality liable for any conceivable constitutional violation, whether based on past concrete injury or mere speculation, would erode its ability to manage and govern.

As a final matter, McDowell insists that Anderson v. City of Atlanta, 778 F.2d 678 (11th Cir. 1985) is controlling and diminishes his burden of establishing deliberate indifference to one of "proving a policy of deficiencies in staffing or procedures such that [he] is effectively denied access to adequate medical care." Id. at 686 n.12. We find no merit in McDowell's argument, and his situation distinguishable from Anderson. In Anderson, Atlanta police deputies arrested Larry Anderson and transported him to the city jail. Anderson informed deputies at the time that he needed medical assistance because he had overdosed on drugs. Deputies instead placed Anderson in a holding cell. Anderson remained in the cell throughout the night, and deputies discovered his lifeless body the next morning. The medical examiner determined that Anderson likely died of a drug overdose. A jury held the

19

county liable under § 1983, and awarded damages, but the district court entered a judgment notwithstanding the verdict. We reversed that decision, finding that the City of Atlanta did violate Anderson's constitutional rights.

The facts in Anderson demonstrated a complete departure from operating procedure whereby the jail was required to staff healthcare personnel at all times. The jail never hired a nurse for the 11:00 P.M. to 7:00 A.M. shift, when Anderson arrived and later died at the jail. Anderson, 778 F.2d at 684. Moreover, the medical examiner testified that deputies probably never checked on Anderson, despite their insistence that they had done so. Id. at 685. This Court acknowledged the "gross indifference" that existed. On the other hand, Mr. McDowell was treated by Nurse Brown and other medical staff consistently monitored his condition both in the Jail's clinic and the intake area. The Jail had a policy in place to rectify any understaffing that would result in delay of medical transports. An ambulance would be called to transport the inmates to Grady if either the situation was emergent or the field division lacked manpower to accomplish the transport. McDowell's injuries result more from a breakdown in communication rather than from understaffing or an abrogation of Jail procedure. As Anderson makes clear, "[a] municipality can generally not be liable for a single act of negligence or misconduct." Id. at 685.

20

In the instant case, the record is barren of any evidence of implementation of an intentionally malevolent or impermissible policy by the Board so as to authorize a cause of action against Dekalb County under 42 USC § 1983. The fact that the Board's budget practices resulted in understaffing does not amount to a purposeful disregard which would violate any citizen's constitutional rights. McDowell "may not infer a policy merely because harm resulted from some interaction with a governmental entity." Colle v. Brazos County, Texas, 981 F.2d 237, 245 (5th Cir.1993). There is no indication that Dekalb County deliberately invoked a policy to interfere with the Jail's provision of medical care to inmates or to deny inmates access to medical care. McDowell's argument in this case is essentially a medical malpractice claim which is insufficient to establish liability under 42 USC § 1983. Estelle v. Gamble, 429 U.S. 97, 106 (1976). Accordingly, summary judgment was properly granted to Dekalb County.

### III. Exclusion of Expert Testimony[9]

We review a district court's ruling on the admissibility of expert testimony for abuse of discretion. General Elec. Co. v. Joiner, 522 U.S. 136, 138-39, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Often, as is the case here, the ruling may be "outcome determinative," but we do not apply a stricter standard even though the ruling results in a summary judgment.[10] See Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (citing Joiner, 522 U.S. at 142-43). "Cases arise where it is very much a matter of discretion with the court whether to receive or exclude evidence; but the appellate court will not reverse in such a case unless the ruling is manifestly erroneous." Allison, 184 F.3d at 1306 (citations omitted). See also, Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 535 (5th Cir. 1974) ("we recognize that the admission or exclusion of expert testimony is a matter within the sound discretion of the trial

---

[9]It is necessary to point out that the district court's original order excluding Mr. McDowell's experts applied to the Fulton-Dekalb Hospital Authority and individual doctors and nurses and Grady. The district court's order did not encompass Wexford or Pernell Brown. Nonetheless, the district court stated that each of McDowell's experts testified that he was not qualified to opine as to the proper actions or the applicable standard of care for nursing.

This issue was reexamined at a hearing on the motion for summary judgment as to Wexford and Nurse Brown. The district court noted again that there was simply no expert testimony with respect to the standard of care for nursing or to show causation.

[10] We review a district court's grant of summary judgment de novo, but here the grant of summary judgment to Wexford was based on the district court's exclusion of McDowell's expert testimony against Wexford, and its subsequent determination that McDowell had no competent expert to testify against Wexford, as required for medical negligence claims under Georgia state law. Mr. McDowell concedes that he does not challenge the grant of summary judgment should we uphold the exclusion of his experts.

22

judge. Only if we determine that his decision is 'manifestly erroneous' may we find that he has abused his discretion and that reversal is required") (citations omitted).[11]

The only claims McDowell has remaining against Wexford involve Georgia state medical malpractice claims. Because the district court exercised supplemental jurisdiction over these claims when it was removed from state court, state law governs substantive issues and federal law governs procedural issues. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). "Proffered expert medical testimony must meet the legal as well substantive issues of the case." Allison, 184 F.3d at 1320 (citing In re Breast Implant Litig., 11 F.Supp. 2d 1217, 1226 (D.Colo. 1998). Rules of procedure encompass rules of evidence, and therefore, the Federal Rules of Evidence, not state evidentiary laws, apply. See 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, § 4512 (2d ed. 1996). Moreover, we wrote that the admissibility of expert testimony is a matter of federal, rather than state procedure. See U.S. v. Roark, 753 F.2d 991, 994 (11th Cir. 1985); Edwards v. Sears, Roebuck and Co., 512 F.2d 276, 292 (5th Cir. 1975).

Some state evidentiary rules are substantive in nature, and transcend the substance-procedure boundary, creating a potential Erie conflict. See Bradford v.

---

[11]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Bruno's, Inc., 41 F.3d 625 (11th Cir. 1995) (finding that Alabama's collateral source rule is substantive in nature); Ungerleider v. Gordon, 214 F.3d 1279, 1282 (11th Cir. 2000). In Legg v. Chopra, the Sixth Circuit examined the interplay of expert testimony with Tennessee's medical malpractice statute and the Federal Rules of Evidence. 286 F.3d 286 (6th Cir. 2002). The Sixth Circuit determined that "state witness competency rules are often intimately intertwined with a state substantive rule. This is especially true with medical malpractice statutes, because expert testimony is usually required to establish the standard of care." Id. at 290. Legg further announced that the Federal Rules of Evidence settled this potential conflict with Rule 601, which "incorporates the Erie mandate by expressly providing that when State law supplies the rule of decision, the competency of a witness shall be determined in accordance with state law." Id. (citing Fed.R.Evid. 601). Legg mandated that "if a witness is deemed competent to testify to the substantive issue in the case, such as the standard of care, his or her testimony should then be screened by Rule 702 to determine if it is otherwise admissible expert testimony." Id. at 292 (emphasis added).

We agree. Here, the "law of Georgia as it pertains to medical malpractice actions is applicable." Smith v. Am. Transitional Hosps., Inc., 330 F.Supp. 2d 1358, 1361 (S.D. Ga. 2004). In order to prove medical malpractice in Georgia, a plaintiff

must prove: "(1) the duty inherent in the health care provider-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained." Smith, 330 F. Supp. 2d at 1361 (quoting Knight v. West Places Ferry Hosp., Inc. 262 Ga.App. 220, 585 S.E. 2d 104, 105 (2003)). In order to prove the causation prong, a plaintiff "must present medical testimony." Smith, 330 F.Supp. 2d at 1363 (quoting Zwiren v. Thompson, 578 S.E. 2d 862, 866 (Ga. 2003). See also, Smith v. Luckett, 155 Ga. App. 640, 641 (1980); Pilzer v. Jones, 242 Ga. App. 198, 201 (2000). Once a plaintiff has met the burden of producing a competent expert, a district court must still engage in a Rule 702 analysis, since the state law "is directed at establishing a substantive issue in the case," while the gatekeeping structure of Rule 702 is "designed to ensure fair administration" of the case. Legg, 286 F.3d at 292. Essentially, "once a witness is deemed competent to testify to the substantive issue of the case, his or her testimony should then be screened by Rule 702 to determine if it is otherwise admissible expert testimony." Legg, at 292.[12] The analysis we engage in then, is first whether the expert is qualified to render an opinion regarding the standard of care

---

[12] The Sixth Circuit noted in Legg, that the two Rules, 601 and 702, work in "tandem" because Rule 601 addresses a witness's "competency," making it a substantive rule, while Rule 702 measures an expert's "qualifications," and is "directed at the science and methodology behind the witness's testimony." Legg, 286 F.3d at 291 (emphasis in the original).

(the competency component), and second, whether the expert's causation theory meets the strictures of Rule 702.

Accordingly, for McDowell's claim against Wexford to succeed, he first needed to present "competent expert testimony" that Wexford's nursing staff proximately caused his injuries. Smith, 330 F. Supp. 2d at 1361. "This requisite subsumes the burden of providing expert testimony as to what the applicable standard of care is." Id. In its competency determination, the district court excluded McDowell's experts, finding them unqualified to render an opinion as to the standard of care applicable to nurses. Indeed, McDowell's three experts, Drs. Merikangas, Darouiche, and Gower are all experts in the field of neurology, and the district court found them qualified to testify about McDowell's spinal epidural abscess as well as causation on the part of Grady's doctors. Although the district court did not initially consider the experts' testimony as it pertained to nursing and specifically Nurse Brown's actions, it later extended its findings to include Wexford when it granted summary judgment.

For a witness to "constitute an 'expert competent to testify,'" his realm of expertise must encompass "knowledge of the standard of care applicable to the defendant-professional as to at least one of the matters on which the plaintiff's malpractice claim is based." Lee v. Visiting Nurse Health Sys. of Metro. Atlanta, 477

S.E.2d 445, 447 (Ga. App. 1996) (citing Ga. Code Ann. § 9-11-9.1(a)). Here, the district court determined that the doctors were not sufficiently familiar with the standard of care applicable to nurses, and thus excluded their testimony. The district court, did not, however, consider Georgia law in making its ruling. In Georgia, a physician has been found to be competent to testify to the standard of care for licensed practical nurses. Howard v. City of Columbus, 466 S.E.2d 51, 56 (Ga. App. 1995). In Howard, the estate of a deceased inmate sued the city, county, sheriff and medical personnel at a jail for medical malpractice resulting from the failure to treat the inmate's diabetes. In reversing the trial court's dismissal of the complaint, the appellate court found the plaintiff's expert, a medical doctor, to be competent to testify against the jail's nurses. Id. at 56 (citing Crook v. Funk, 447 S.E.2d 60 (Ga. App. 1994)).

In McDowell's case, Wexford argues that McDowell's experts do not possess the education, training, or experience that would qualify them to testify against a jail nurse. Wexford points with specificity to Dr. Dariouche's deposition, and asserts that he his lack of experience in working in a jail renders his opinion unqualified. To the contrary, Dr. Dariouche stated he had not reviewed the hospital nurses' testimony and that he could not provide an opinion regarding those nurses. Dr. Dariouche did, however, testify as to the standard of care applicable to Wexford nurses, and opined

27

that while she may have acted reasonably, Nurse Brown should have called an ambulance for McDowell. Dr. Darouiche's opinion stems from a knowledge of medical care, not jail policies.

The standard of care applicable to nurses is universal, and does not diminish when the setting is a jail rather than hospital. Wexford has not given us a reason to differentiate between jail nurses and hospital nurses. A physician's area of expertise necessarily encompasses the standard of care applicable to nurses. See Crook, 447 S.E.2d at 62-63 (physician was competent to testify that nurses were negligent in failing to assist a cardiac patient in need of medical attention); Tye v. Wilson, 430 S.E.2d 129, 130 (Ga. App. 1993) (testimony of medical doctor concerning standard of care in treating and monitoring intubated patient was sufficient to support malpractice claim against nurse; doctor was familiar with standard of care acceptable to medical profession generally, and there was no suggestion that medical doctors and nurses were trained to treat intubated patients differently); Lee, 477 S.E.2d at 447 (doctor had knowledge of standard of care to testify against physical therapist). Moreover, Georgia courts have qualified nurses to testify against doctors. See Avert v. McCormick, 271 S.E.2d 832 (Ga. 1980).

The district court disqualified all of McDowell's experts on the issue of the standard of care applicable to emergency room medicine, but did not conduct a

similar inquiry with regard to Wexford's nurses in the jail. Instead, the district court dropped a footnote in its order excluding McDowell's experts against Grady stating that "each of McDowell's experts testified that he is not qualified to opine as to the proper actions or the applicable standard of care for nursing." Only later did the district court rule that because it had closed discovery on the issue of the standard of care and causation with respect to Nurse Brown and Wexford, McDowell had no expert testimony, as Georgia requires for medical malpractice claims. See, Pilzer v. Hones, 242 Ga. App. 198, 201 (2000); Smith v. Luckett, 155 Ga. App. 640, 641 (1980).

We find this broad ruling to be in error. "The proffered physician need not be a specialist in the particular medical discipline to render expert testimony relating to that discipline." See Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planifacacion, 345 F.3d 15, 24 (1st Cir. 2003). The district court determined that because the experts were not board certified in emergency medicine, they could therefore not render an opinion as to the standard of care applicable to emergency room physicians and nurses. Wexford would have us extend that decision to its nurses because McDowell's experts do not practice in jails. An expert, however, "is one who qualifies as such by reason of special knowledge and experience, whether or not he is authorized to practice in his special field under licensing requirement imposed by

29

statute." See Paradise Prairie Land Co. v. United States, 212 F.2d 170, 173 (5th Cir. 1954).

A review of the record demonstrates that all three of McDowell's experts testified as to the applicable standard of care with regard to Wexford's nurses. Only Dr. Dariouche explicitly stated that he was "not an expert on the standard of care for nurses working in the emergency room." Dr. Dariouche, however, made this statement with regard to the Grady nurses and their emergency room treatment of McDowell. This opinion did not encompass the Wexford nurses and the delay in transporting McDowell to Grady. Moreover, Dr. Merikangas clearly included a discussion on the nurses' standard of care in his deposition testimony, and Dr. Gower offered that the "standard of care really should have elected the most rapid transport" to Grady. It is true that Drs. Darouiche and Merikangas explained that Nurse Brown may well have acted reasonably, but an opinion that is incompatible with a plaintiff's case alone does not render that expert unqualified. In accordance with Georgia law, we find the experts competent to render opinions as to the applicable standard of care for Wexford's nurses.

Our inquiry, however, does not end at the competency determination. In order to survive summary judgment, McDowell's experts must establish both a breach of the standard of care and that Wexford's actions were a proximate cause of his

injuries. Smith, 330 F. Supp. 2d at 1361. See also Cannon v. Jeffries, 551 S.E.2d 777 (2001); Bowling v. Foster, 562 S.E.2d 776 (2002); O.C.G.A. § 51-1-27. McDowell must prove that Nurse Brown's actions caused the delay in his treatment and exacerbated his condition. It is the causation testimony that we evaluate under the guide of Fed.R.Evid. 702.

McDowell bears the burden of demonstrating that each of his proffered experts is qualified to render an expert opinion, that the opinion is reliable, and that the opinion would assist the trier of fact in resolving a disputed issue of material fact—here, causation. Fed.R.Evid. 702; see, e.g., Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1316 (9th Cir.), cert. denied, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) (Daubert II ).

The district court found all of McDowell's experts qualified to testify as to the issue of causation, i.e., the nature of the spinal epidural abscess and McDowell's resulting paralysis. Nevertheless, a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method." See Clark v. Takata Corp., 192 F.3d 750, 759 n.5 (7th Cir. 1999). After evaluating the experts' proposed testimony and methodology, the district court excluded the causation testimony.

Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court impressed a gatekeeping role upon judges, and directed them to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Id. at 589.

Daubert put forth a two-pronged analysis, used to determine the admissibility of the proffered expert testimony on scientific issues under Rule 702. First, the expert testimony must be reliable, so that it must be "scientific," meaning grounded in the methods and procedures of science, and must constitute "knowledge," meaning something more than subjective belief or unsupported assumptions. Daubert, 509 U.S. at 590.

Daubert's reliability prong sets out four guideposts that a district court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the

32

technique has been generally accepted in the proper scientific community. <u>See</u>

<u>Daubert</u>, 509 U.S. at 593-94; <u>Allison v. McGhan Medical Corp.</u>, 184 F.3d 1300, 1312

(11th Cir. 1999); <u>Kuhmo Tire Co. v. Carmichael</u>, 526 U.S. 137, 149 (1999). In

addition, other factors that a court may consider in the <u>Daubert</u> analysis are reliance

on anecdotal evidence (as in case reports), temporal proximity, and improper

extrapolation (as in animal studies). <u>Allison</u> at 1312. Finally, a court should

meticulously focus on the expert's principles and methodology, and not on the

conclusions that they generate. <u>Allison</u>, 184 F.3d at 1312 (citing <u>Daubert</u>, 509 U.S.

at 595).

The second prong of the <u>Daubert</u> analysis requires that the proposed testimony

be relevant. To meet this requirement, the expert testimony must be "'relevant to the

task at hand,' … i.e., that it logically advances a material aspect" of the case. <u>Daubert</u>

at 591. The relevance requirement is not satisfied where the proffered testimony does

not assist the trier of fact. Fed.R.Evid. 702. The relationship must be an appropriate

"fit" with respect to the offered opinion and the facts of the case. <u>See</u> <u>Daubert</u>, 509

U.S. at 591, 113 S.Ct. 2786. Under <u>Daubert</u>, scientific testimony does not assist the

trier of fact unless the testimony has a justified scientific relationship to the pertinent

facts. <u>See</u> <u>Daubert</u>, 509 U.S. at 591, 113 S.Ct. 2786. For example, there is no fit

where a large analytical leap must be made between the facts and the opinion. <u>See</u>

General Electric Co. v. Joiner, 522 U.S. 136 (1997) (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is "simply too great an analytical gap between the data and the opinion offered").

A district court is thus required to act as a gatekeeper "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, (1999). "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive." Daubert II, 43 F.3d at 1315-16.

A district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," and we give that discretion a large degree of deference. Kumho Tire, 526 U.S. at 152. The Supreme Court did not intend, however, that the gatekeeper role "supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Allison, 184 F.3d at 1311-12 (quoting Daubert, 509 U.S. at 596). The judge's role is to see that the jury hears reliable and relevant evidence because of its ability to assist in factual

34

determinations, its potential to clarify issues, and its probative value. Id. Thus, we turn to the district court's conclusions concerning each expert.

## A. Doctor James Merinkangas

Mr. McDowell claims that the delay in treating his spinal epidural abscess caused or worsened his condition. To support this, Dr. Merinkangas proposed that early treatment of a patient with spinal epidural abscess reduced neurological damage. The district court labeled this theory as "the earlier, the better." Additionally, Dr. Merinkangas also opined that the four-hour delay (on the part of the Grady defendants) caused Mr. McDowell's injuries. Dr. Merinkangas based his theory on the common sense and "universal" axiom that expedited treatment is preferable to delayed treatment. Dr. Merinkangas also pointed to a study in SPINAL CORD COMPRESSION, which analyzed the effects of 48-hour delays in treatment. The district court determined that Merinkangas's theory lacked testing, peer review, a potential error rate, and general acceptance. We agree.

The district court was correct in finding that "the earlier, the better" theory was "too vague" to assist the trier the fact. Indeed, the notion of early treatment is well within common knowledge that would be obvious to the average juror, but has nothing to do with causation. Dr. Merinkangas himself stated that "the sooner, the better" is "just simply common understanding, and doesn't rise to the level where

35

someone would bother reporting that because everyone knows that." As such, this "the earlier, the better" theory adds nothing absent some testimony connecting the delay to the causation or aggravation of an injury.

We also agree with the district court's conclusion that Dr. Merinkangas's contention that McDowell's injury could have been prevented had he entered surgery four hours earlier failed the Daubert analysis.[13] Dr. Merinkangas could not identify any empirical data, survey, study, or literature to support his theory, save the study in SPINAL CORD COMPRESSION, which dealt with a delay of 48 hours, which is more than twice the delay here. Notwithstanding his lack of support, Dr. Merinkangas further opined that had McDowell been treated 24 hours earlier, then he would have no resulting paralysis. Taking either of Dr. Merinkangas's propositions (a four-hour delay or twenty-four delay), there is no support addressing anything less than a 48-hour delay. There is a considerable gap between a 24-hour to a 48-hour delay, and even more so with a 4-hour delay. This runs afoul of Allison's admonition that a theory should not "leap" from an accepted scientific premise to an unsupported one. 184 F.3d at 1314. Furthermore, an expert opinion is inadmissible when the only

---

[13] The district court excluded Dr. Merinkangas' theory after evaluating it in terms of the Grady defendants. Specifically, the district court weighed the theory as to the delay in surgery at Grady rather than the delay in transport at the Jail, which is the issue here. Nonetheless, the district court's conclusions are pertinent to our inquiry because the issue, delay in treatment as the cause of injury, is the same.

connection between the conclusion and the existing data is the expert's own assertions, as we have here. See General Electric v. Joiner, 522 U.S. 136, 146 (1997). This falls short of "general acceptance" prong of reliability.

Finally, Dr. Merinkangas has not tested his own theory nor determined any error rate associated with it. See Daubert, 509 U.S. at 593. Dr. Merinkangas simply made a blanket statement that the delay caused the paralysis, but gave no opinion as to whether the sum of the delays compounded McDowell's injuries, or if just one delay created the damage. Based on Dr. Merinkangas's opinions, it is impossible to mete out whether the initial delay at the Jail contributed to the cause at all. Thus, without a viable theory with which to link Wexford's negligence to McDowell's injury, the district court properly excluded Dr. Merinkangas's testimony.

## B. Dr. Rabih Darouiche

Like Dr. Merinkangas, Dr. Darouiche concluded that McDowell would have suffered less injury had he been treated earlier. Also like Dr. Merinkangas, Dr. Dariouche's theory specifically related to the delay in surgery rather than the delay at the Jail. Dr. Darouiche based his theory on his past experience and training with spinal patients and on his observation that a more rapid progression of neurological damage indicated that earlier treatment would be successful. Dr. Darouiche frequently explained that his causation theory lacked empirical evidence or scientific support,

and he acknowledged an absence of studies which assess surgery at the four, eight, twelve, eighteen, or twenty-four hour time intervals. Instead, and in accord with Dr. Merinkangas, Dr. Darouiche relied upon "medical logic" to suggest that early treatments effects an improved condition.

Dr. Darouiche also admitted that his "logic" theory lacked proof, and he could not quantify what McDowell's condition would have been had surgery occurred at an earlier point. Additionally, Dr. Darouiche made no attempt to refute, test, or falsify his theory, and did not identify whether the actions of one or many caused McDowell's injury. Instead, Dr. Darouiche pointed out the condition's rarity and that it lacked observable patients. Complicating this expert's theory further is the fact that it has never been published or subjected to peer review. Dr. Darouiche further testified that McDowell may very well have suffered the same injuries had he been treated within six hours. We agree with the district court that Dr. Darouiche's proffered testimony was more of a guess than a scientific theory. Daubert would permit an expert to draw conclusions from existing data, but in this case the expert drew conclusions where there was no existing data. See Joiner, 522 U.S. at 146. A mere guess that earlier treatment would either have improved McDowell's condition or rendered it the same simply fails the tests for expert opinion. Without a theory that

meets the requirements of Rule 702, the district court properly excluded Dr. Darouiche's testimony.

## C. Dr. David Gower

Dr. Gower's proffered testimony reiterated that of Drs. Merinkangas and Darouiche; namely, that if McDowell had been treated earlier, his recovery would have been faster. Dr. Gower could not, however, measure the level that McDowell's improvement might have been, only stating that "instead of taking years, [recovery] might have only taken a couple of months." Dr. Gower acknowledged that there were no scientific studies that bolstered his theory, but explained that there were significant reports and case studies demonstrating that extended paralysis reduced the possibility of a full recovery. Dr. Gower, however, could not specifically identify any such articles, case studies or reports to support this premise. Even more telling is that Dr. Gower opined that when compared to other patients who experienced 24-36 hour paralysis, McDowell "seem[ed] better than most," and Gower expressed surprise at McDowell's degree of recovery. In effect, McDowell himself did not fit Dr. Gower's theory. Without any support, Dr. Gower's opinion failed to meet Daubert's reliability requirement, as it had not been tested, subjected to peer review, or assigned a rate of error. We agree with the district court's decision to exclude Dr. Gower's testimony.

In sum, although we find that the district court erred in excluding the experts' testimony as to the applicable standard of care, we hold that the district court did not abuse its discretion in barring the causation testimony against Nurse Brown and Wexford. As the Supreme Court wrote in Daubert, scientific evidence must "fit" the plaintiff's theory of causation. 509 U.S. at 591. In this case, none of the doctors' theories "fit" as evidence relevant to the cause of plaintiffs' injuries.

More importantly, McDowell does not argue that the doctors' causation theories are sound. Instead, McDowell complains that the district court abused its discretion by extending its ruling that the evidence was inadmissible against Grady to the Wexford defendants. Such action by the district court is well within the ambit of its discretion, and McDowell has not demonstrated why the testimony is reliable and admissible under Daubert, Kuhmo Tire, and Fed.R.Evid. 702. We agree with the district court that the testimony "essentially boils down to an opinion that earlier surgical intervention would be preferable." The experts then made the leap from this "presumably accepted scientific principle…to an unsupported scientific principle…that a delay of more than four hours caused Plaintiff's injury." This "leap of faith" was supported by little more than the fact that early treatment begets improved recovery. The experts, however, provided no existing research detailing the extent of injury or recovery at different time intervals.

40

McDowell has offered no reliable evidence that earlier medical intervention would have prevented or diminished his injury. We hold that the district court did not abuse its discretion in concluding that McDowell's evidence is legally unreliable and inadmissible under the standards set by <u>Daubert</u> and its progeny.

## III. Conclusion

Although Mr. McDowell's circumstances are unfortunate, he has no remedy here. Having held first that Mr. McDowell cannot establish a genuine issue of material fact as to any Dekalb County policy causing or contributing to his injury, the district court's grant of summary judgment to Dekalb County was proper. Second, we hold that the district court did not abuse its discretion in concluding that McDowell's experts simply failed to meet the requirements of the law. Summary judgment in favor of Wexford and Brown was proper. Therefore, we affirm the decisions of the district court.

**AFFIRMED.**