[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13418

Non-Argument Calendar

_____

MICHAEL J. WAPPLER,

Plaintiff-Counter Defendant-Appellant,

*versus*

WAYNE IVEY,

Defendant-Counter Claimant-Appellee,

MICHAEL HATTON,
DEPUTY BISBEE,
EVELYN DENARDO,
K. DAVIS,
Deputy, et al.,

2                    Opinion of the Court                    22-13418

Defendants-Appellees,

DEPUTY SHERIFF
"Chief",

Defendant.

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:19-cv-01224-CEM-EJK

————————————

Before ROSENBAUM, GRANT, and LAGOA, Circuit Judges.

PER CURIAM:

Michael Wappler, proceeding *pro se*, appeals the district court's grant of summary judgment in favor of Brevard County and the sheriff of Brevard County (collectively, the "defendants") on Wappler's 42 U.S.C. § 1983 civil rights claim. Wappler argues that the district court erred by: (1) granting summary judgment in favor of the defendants because the court found that the conditions of Wappler's confinement did not violate his constitutional rights; (2) granting summary judgment for the defendants on Wappler's due process and retaliation claims because the court found that jail officials did not engage in retaliatory conduct and Wappler's due

process rights were not violated; (3) granting summary judgment in favor of the sheriff in his official capacity on the sheriff's counterclaim for liquidated damages pursuant to Fla. Stat. §§ 960.293 and 960.297 because the court found that Wappler did not dispute the counterclaim; and (4) denying Wappler's motion for leave to file a second amended complaint. For the reasons set forth below, we affirm the district court's order as to issues one, two, and four. As to issue three, we vacate the order and remand for further proceedings.

## I.    FACTUAL & PROCEDURAL BACKGROUND

On April 5, 2019, Wappler filed a *pro se* § 1983 complaint in state court against (1) Wayne Ivey, then a sheriff of Brevard County, (2) Michael Hatton, who was employed by the Brevard County Jail (the "jail"), and (3) Deputy Bisbee, who was a deputy at the jail.

On July 3, 2019, Ivey, Hatton, and Bisbee filed a notice of removal. On September 12, 2019, Wappler filed an amended *pro se* § 1983 complaint against Brevard County (the "County") as well as Ivey and other officers, including Hatton, Bisbee, Evelyn DeNardo, Deputy K. Davis, Deputy Davenport, Corporal Banks, "Chief Deputy Sheriff," and "Sgt. 695" (collectively, the "officers") in their individual and official capacities. Wappler brought claims based on the conditions of his confinement and the officers' retaliatory conduct during his time at the jail as a pretrial detainee from November 7, 2017, to May 1, 2019. He alleged that his First, Eighth, and Fourteenth Amendment rights, as well as his due process rights,

were violated.  He alleged that the County and Ivey were deliberately indifferent to his rights not to be punished as a pretrial detainee.  He also alleged that the County's and Ivey's "procedures, customs, and practices," including inadequate funding of the jail, caused the deprivation of his constitutional rights.

As to his conditions-of-confinement claims, Wappler alleged the following facts.  The County was responsible for "adequately fund[ing]" Ivey and the sheriff's office to avoid overcrowding in the jail. On November 8, 2017, Wappler was "placed in [the] Unit 501 bubble," which he described as an "intake 'overflow' cell," partially due to "overcrowding."  The conditions in the bubble—caused by the County and Ivey's policies, practices, and customs— were "inhumane."  In the bubble, Wappler was placed in an overcrowded strip cell where eight men shared one open toilet and he was forced to sleep on the "cold filthy concrete floor" without a bunk or mattress.  He did not have a chair or table, eating utensils, shoes, or socks.  And though he was provided a blanket and a uniform, he was without underwear, a towel, and hygiene items.  He was "co-mingled with sentenced and mentally ill" individuals; he was denied a Bible, reading and writing materials, and legal documents; and he was exposed to "excessive noise and light 24/7."  He could not shower or shave, he did not have toilet paper, and he was denied any time out of the cell for fresh air.  On November 14, 2017, he was transferred to an overcrowded cell in the "Charlie Unit," where he was subjected to "triple bunking" that exceeded the permissible capacity of the space.

Wappler also alleged the following. From November 18, 2017, to May 1, 2019, he was "moved to other various cells/pods all identical, where [he] was subjected to being 'triple bunked'" in cells designed for a single person. The extremely noisy conditions in overcrowded rooms caused "ringing in the ears," headaches, and anxiety. In total, the various issues during his detention included: (1) "triple bunking"; (2) noisy and overcrowded conditions; (3) being confined with "sentenced prisoners"; (4) being "locked-down in excess of [11] hours per day"; (5) "filthy cells" with no sanitation supplies; (6) the lack of shoes or adequate footwear, resulting in "toenail damage from fungus"; (7) "sensory deprivation" conditions because of the blacked-out jail windows; and (8) the lack of recreation, fresh air, and sunshine.

As to his retaliation claims, Wappler alleged the following facts. In November 2017, he began filing "grievances and civil actions" to "redress" the wrongs being committed at the jail. After Ivey, Hatton, and DeNardo learned of Wappler's complaints, several defendants took retaliatory actions against him. "[W]ithin days" of filing one of his grievances, Wappler was placed in "disciplinary confinement" even though he "violated no rules." The next day, April 16, 2018, Deputy Bisbee gave him an incident report that falsely charged him with misconduct. During a hearing held for this incident report, he could "not hear fully defendants' reading of a statement," was not allowed to read the statement, and was not provided with either a video or statements that Hatton and Bisbee mentioned. He was found "guilty" and had to serve another 15 days in "punitive confinement." On "Good Friday" in 2019 (a

few days after the hearing), DeNardo and two other officers falsely charged Wappler with misconduct after he helped another inmate, "Mr. Silvestri," submit a grievance.  During that interaction, DeNardo told Wappler, "[Y]ou were seen on the kiosk writing a grievance[.] My bosses Ivey and I [sic] we don't want no paralegal office in this jail."  When Wappler asked for a copy of the written narrative to support the disciplinary report, Davenport refused to give him a copy and Davis told him to "get [it] from public records."  Wappler was again placed in disciplinary confinement after being found "guilty" by Davis.

Wappler alleged that the constitutional violations resulted in the following injuries: permanent damage to his hearing, anxiety, sleep disturbance, and emotional distress.  He sought compensatory and punitive damages and a "no contact" order against the individually named defendants.  He also attached a drawing of a cell, showing that there was a bunk bed against one wall of the cell and a singular cot against the opposite wall, totaling to three beds in that one cell.

Ivey and the officers moved to dismiss Wappler's amended complaint, and the motion clarified certain names of the parties in Wappler's amended complaint as follows: "Deputy K. Davis" was Christine Davis, "Chief Deputy Sheriff," was Michael DeMorat, and "Sgt. 695" was James Cochran.[1]  The County also moved to dismiss the amended complaint.  Wappler opposed both motions.

---

[1] From here on, we reference "Cochran" instead of "Sgt. 695

The district court granted in part and denied in part Ivey's and the officers' motion to dismiss.  The court dismissed the case as to Ivey and the officers in their official capacities because Ivey in his official capacity already represented the County, and thus any allegations against Ivey in his official capacity operated as allegations against the County.  The court also dismissed the case with prejudice as to DeMorat for failure to state a claim.  The court denied the motion in all other respects, and it denied the County's motion to dismiss.

The County, Ivey, and the officers answered Wappler's amended complaint, denying Wappler's allegations that his constitutional rights were violated and asserting affirmative defenses.

Ivey, in his official capacity as the sheriff, further asserted a counterclaim for incarceration costs as liquidated damages under Florida Statute §§ 960.293 and 960.297.  Ivey asserted that on April 22, 2019, Wappler entered a guilty plea in Brevard County state court and was sentenced to 60 months' imprisonment, such that Ivey was entitled to liquidated damages—calculated at $50 per day pursuant to section 960.293(2)(b)—in the amount of $91,250.

Wappler answered Ivey's counterclaim, asserting that he had not served his 60-month sentence yet, so the total amount alleged by Ivey was "fraudulent," "premature," and "unenforceable."  He argued that the counterclaim was filed to retaliate against him for filing his amended complaint, the district court had no jurisdiction over the counterclaim, Ivey abandoned this claim by failing to raise it first before the state court, and the counterclaim would

"invalidate" his plea agreement and constitute "double jeopardy." He also asserted that Ivey did not have standing to bring forth the counterclaim, Ivey would be unjustly enriched for housing him in unconstitutional conditions of confinement, Ivey was selectively enforcing the statute in an unconstitutional way, and the counterclaim would have a prejudicial effect on the jury. He asked the district court to "abstain from exercising supplemental jurisdiction over the counterclaim, or alternatively dismiss it with prejudice" because the counterclaim was filed for "improper purposes."

On March 1, 2021, Wappler moved to file a second amended complaint because Ivey's discovery disclosure "significantly and materially alter[ed] factual allegations and provided the names and employment positions of persons responsible for [the] constitutional violations at bar." Wappler sought leave to include additional allegations against Cochran, Davis, and Hatton about their roles in the disciplinary proceedings because he did not use their proper names in his original complaint. Wappler also asked to include additional disciplinary records and "add the two supervisors personally responsible for approving and or failing to release Plaintiff from the illegal punitive confinement." He also sought to add "previously unknown facts" about the County's fire inspection report, statistics about the number of prisoners, and the definition of overcrowding, and to add the jail's consent decree, population numbers, and capacity. And Wappler requested leave to assert new claims under the First Amendment "on behalf of other" and the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), "resulting from the denial of religious visits set forth in paragraphs 27-30 of the operative complaint."

The County, Ivey, and the officers responded jointly, opposing Wappler's motion to amend. They asserted that the parties had been proceeding under his amended complaint for almost a year and a half and argued that the district court should deny his request to add claims under the RLUIPA and First Amendment for undue delay and as futile.

The district court denied Wappler's motion for leave to file a second amended complaint, finding that Wappler offered no good reason why he could not have brought the RLUIPA and First Amendment claims earlier, he failed to set forth any factual allegations to support the essential elements of either claim, and he failed to identify the parties against whom he intended to assert either claim. The district court determined that Wappler's operative amended complaint already alleged that Davis and Hatton were personally responsible for the alleged misconduct during disciplinary proceedings and thus any other claims about their roles in those proceedings would not be new. It further found that he did not set forth the positions of the unnamed two supervisors who were responsible for his "illegal punitive confinement" and how they were responsible, and thus, his allegations did not establish a cause of action. Lastly, the district court found that Wappler did not demonstrate good cause to file a second amended complaint.

Ivey and the officers later moved for summary judgment in their favor,[2] and the County did the same. The County asserted that Wappler presented no evidence showing that he was "triple-bunked" for purposes of punishing him for no legitimate reason, considering that Wappler's drawing from his amended complaint showed a typical cell that was sufficient to accommodate three people. It contended that Wappler's complaint that he was placed with dangerous felons was misleading because the fact that he was housed at times with people who had a criminal history was unsurprising, and it did not amount to punishment under § 1983. It asserted that his complaints of not having comforts such as a chair, a table, utensils, shoes, socks, reading materials, or television, did not amount to punishment. The County argued that, though Wappler's chief complaint seemed to be that the jail was too loud, and it might have contributed to hearing loss, he presented no evidence that the conditions of his confinement caused his alleged hearing loss, nor did he present evidence that he in fact suffered from hearing loss. It asserted that he presented no evidence that the conditions of his confinement caused his alleged toenail fungus, considering that he testified that the jail was regularly cleaned, and that any unsanitary condition that he alleged did not amount to an unlawful condition. Finally, it argued that the fact that Wappler's

---

[2] Ivey and the officers filed their original summary judgment motion and then, one day later, an amended motion. When we refer to their motion, therefore, we mean the amended motion that the district court ultimately ruled on.

detention interfered with his desire to live as comfortably as possible did not convert the conditions of his detention into punishment.

The County also argued that even if Wappler showed evidence of a constitutional violation, he had no evidence that any official County policy, custom, or practice was "the moving force" behind any such violation. It asserted that he failed to show any evidence that the County had a policy, practice, or custom of failing to adequately fund the jail or Ivey, considering that the County offered evidence that it approved budget requests for the jail that Ivey submitted. It argued that he failed to point to any evidence showing any causal link between his claims of inadequate funding and his alleged constitutional violations, considering that the County and the sheriff in 1993 entered a final consent decree to avoid overcrowding the jail, and none of the factors that contributed to the overcrowding of the jail at the time related to the funding of the jail or the sheriff.

In support of its motion for summary judgment, the County filed the following exhibits: (1) Wappler's deposition;[3] (2) the County's answers to Wappler's first set of interrogatories, which included that it approved budget requests that Ivey submitted for the jail; (3) the order terminating the final consent decree in a

---

[3] Because both the County's motion for summary judgment and Ivey's and the officers' amended motion for summary judgment cited Wappler's deposition, we summarize Wappler's deposition below.

separate case, which showed that in 1993, the County and the sheriff at the time entered a final consent decree not to operate the jail in excess of its overall capacity; (4) the report filed in that separate case, identifying the major factors that contributed to overcrowding in the jail—none of which included inadequate funding; and (5) the County's response to Wappler's revised first set of interrogatories.

Ivey and the officers, in their own motion, similarly argued that they were entitled to summary judgment on all Wappler's claims. Ivey asserted that Wappler's conditions-of-confinement claims against him failed because Wappler presented no evidence that he was triple-bunked for purposes of punishment for no legitimate reason, and the practice of triple-bunking itself did not amount to a constitutional violation. Ivey asserted essentially the same arguments as the County regarding Wappler's claims about placement with dangerous felons in the same cell, lack of access to certain comforts, exposure to noise, and exposure to unsanitary conditions. He asserted that there was no evidence that he had any personal involvement in these conditions and that Wappler failed to present any evidence of either a constitutional violation or a policy or custom behind any alleged constitutional violation. Ivey further argued that he was entitled to summary judgment on his counterclaim for incarceration costs because Wappler entered a guilty plea and was sentenced to 60 months' imprisonment and thus he was entitled to a total of $91,250 under Florida law.

The officers asserted that, as to Wappler's retaliation claims, they were entitled to qualified immunity and summary judgment. They argued that there was video evidence to support the disciplinary actions taken on both April 15, 2018, and April 19, 2019. The officers argued that they did not retaliate against Wappler, and they would have taken the same actions in the absence of his alleged prior protected activity. They argued that as to the April 15, 2018 incident, the jail's security video showed that Wappler, together with another inmate, Michael Delso, faked a slip-and-fall incident in which Delso "fell" in a feigned spill on the floor, aided by Wappler. The officers pointed to the incident report, which recounted that a third inmate, Richard Roberts, provided a recorded statement attesting that Delso planned the "fall" together with Wappler and another man in an effort to sue the County for civil damages. After conducting an investigation, the officers contended, Deputy Bisbee simply informed Wappler of charges brought against him, Hatton conducted the hearing and found him guilty, and Cochran reviewed and signed off the accuracy of the incident report. They argued that Wappler had shown no causal connection between any prior protected activity as far as complaining about jail conditions and the discipline he received for his part in this incident.

As to the April 19, 2019 disciplinary incident, the officers proffered a jail surveillance video showing that Wappler used another inmate, Silvestri's, PIN code to submit a grievance on the jail kiosk system, a violation of jail rules. And, the officers pointed out, Wappler did not deny that he submitted a grievance on behalf of

Silvestri using Silvestri's PIN. The officers contended that, even if Wappler had made a complaint about DeNardo shortly before submitting this grievance, he would have been disciplined for using another inmate's PIN regardless of any such prior protected activity. They argued that Davenport, Davis, and Banks were only involved as to the routine carrying-out of the disciplinary process. They also argued that Wappler was provided a copy of each incident report notifying him of the charges against him and hearings were conducted for each incident and thus his due process rights were not violated.

In support of their amended motion for summary judgment, Ivey and the officers filed Wappler's deposition; the affidavits of Bisbee, Cochran, DeNardo, Davenport, Davis, and Banks; and the videos of the incidents on April 15, 2018, and April 19, 2019.

In Bisbee's affidavit, she stated the following. On April 16, 2018, she notified Wappler of the nature of the accusations against him and documented that he wished to plead not guilty, that he had no witnesses on his behalf, and that he did not wish to make a statement before the hearing deputy. She had no other involvement in the incident. She did not retaliate against Wappler for his prior complaints or grievances made. She added that the same disciplinary action would have been taken in the absence of any alleged protected activity.

In support of her affidavit, Bisbee attached the April 2018 incident report, Wappler's signed "Violation Notification," and the results of the disciplinary hearing. The April 2018 incident report

stated the following. On that date, Delso, an inmate in the Charlie Unit, claimed that he slipped and fell in "the pod" and could not get up. Delso claimed that he slipped on a wet floor even though the floor appeared to be dry. Officers helped Delso get back on his feet to take him to the medical center. Richard Roberts, an inmate, stated that Delso, Wappler, and another inmate, Rain Pipkins, planned the slip-and-fall in advance so that they could sue the Sheriff's Office. Roberts stated that Delso, Wappler, and Pipkins planned this slip-and-fall because Delso had a previous back injury, Wappler knew how to file the necessary paperwork, and Pipkins would provide a sworn statement. The video of the incident corroborated Roberts's statement that the fall was planned because the video showed that the floor was "completely dry." Delso was evaluated by a nurse who found that he had no injuries. Delso, Wappler, and Pipkins denied Roberts's allegations. "Keep separates were placed against three inmates," and "no force was used during this incident."

The pages of the incident report that included Wappler's signature showed that Wappler was charged with "encourag[ing] participat[ing]" as well as "conduct which disrupts" and that Wappler signed the incident report indicating that he understood the accusations against him, he understood the disciplinary actions that were taken, and he had the opportunity to call witnesses and present evidence. The disciplinary hearing results showed that Wappler was found guilty of all charges and he would be placed in disciplinary confinement for 15 days.

Wappler responded to the County's and Ivey's and the officers' motions for summary judgment, opposing both motions in one response. [4] He objected to the use of the videos of the April 2018 and 2019 incidents, arguing that the videos were "inadmissible evidence" because he had not had the opportunity to study the videos outside the presence of the officers' attorneys. Wappler contended that he presented enough evidence to show a genuine issue of material fact as to the psychological harm he suffered from the conditions of confinement. He asserted that he showed that he suffered a physical injury from the unsanitary conditions of the jail because he sustained damage to his toenails from the fungal infection that he contracted in the jail. He argued that Ivey's policy or custom of taking pretrial detainees' shoes and socks upon arrival to the jail and providing flip flops offered no protection, which led to him contracting the fungal infection. He insisted that he showed evidence that the County and Ivey violated his Fourteenth Amendment rights by creating inhumane conditions of confinement.

Wappler also argued that he showed evidence that he sustained hearing loss because of the excessive noise caused by overcrowding. He asserted that he was subjected to inhumane conditions due to the lack of toilet paper, showers, towels, eating utensils, cleaning supplies, and hygiene items. He also asserted that a reasonable fact finder could find that the County and Ivey had a practice or custom of overcrowding and that a reasonable fact

---

[4] Wappler characterized his second filing in response to the motions for summary judgment as "Part II" of the response he had filed.

finder could find that his Eighth Amendment rights had been violated by the County's policies and practices.

In support of his opposition to the motions for summary judgment, Wappler filed the following exhibits: (1) his deposition; (2) a document labeled "Exhibit No. 2 not included" and "to be filed"; (3) an October 2019 chronological record of health from the Florida Department of Corrections ("FDOC") in which he complained that he had ringing in his ears; (4) an FDOC medical staff's consultation request dated March 13, 2020, in which the staff requested that Wappler get a hearing test; (5) an FDOC inmate sick-call request dated September 16, 2020, in which he requested medication for migraines; (6) an FDOC health services document dated September 17, 2020, showing that he had headaches and earaches; (7) two FDOC inmate sick-call requests—one dated November 20, 2020, and one dated December 1, 2020—in which he requested an audiologist for his tinnitus; (8) an FDOC inmate sick-call request dated March 8, 2021, in which he requested treatment for his lower back pain; (9) a hearing test report dated October 12, 2021, noting that his hearing loss was reportedly "too severe" to hear certain of the test-tones; (10) requests that Wappler submitted during his time at jail, showing that he informed the staff that he had ringing in his ears, tinnitus, and difficulty sleeping, that he wanted to move to a different cell because he did not have a bunk, and that he could not get his mail; and (11) a handwritten "declaration" from an inmate named Patrick W. Wharen, who stated that he was a pretrial detainee at the jail and asserted complaints that were generally the same as the ones that Wappler asserted in his amended complaint.

Wappler also filed the following exhibits: (1) an inmate housing history report from the jail; (2) Ivey's response to Wappler's request for admissions; (3) an affidavit from a research associate at the FDOC, who could not locate certain monthly reports from the jail; (4) the County's answers to Wappler's first set of interrogatories; (5) the same drawing of the bunk placements in the cell that he attached to his amended complaint; (6) the April 2018 and April 2019 incident reports; (7) the grievances he filed during his time at the jail; (8) the jail's inmate rules and regulations and disciplinary procedures; (9) an email from an officer stating that he could not locate the recording of Roberts's statement as to the April 2018 incident; and (10) several handwritten "declaration[s]" or "affidavit[s]" from inmates, who stated that they were pretrial detainees at the jail and asserted complaints that were generally the same as Wappler's.

Ivey and the officers replied, reiterating the arguments from their amended motion for summary judgment and contending that Wappler failed to present evidence of unlawful conditions of confinement and Ivey was entitled to summary judgment. They also argued that the videos of the April 2018 and April 2019 incidents were relevant and admissible. They argued that Wappler failed to present evidence to support the retaliation claims, and thus the officers were entitled to summary judgment and qualified immunity. They also asserted that Wappler did not address the counterclaim in his response, and thus Ivey was entitled to summary judgment on the counterclaim.

The County replied to Wappler's response, generally reiterating arguments made in its motion for summary judgment and arguing that it was entitled to summary judgment on all claims because Wappler's evidence was not sufficient to establish a cognizable Eighth or Fourteenth Amendment claim under § 1983.

The district court granted the County's and Ivey's and the officers' motions for summary judgment, and the court dismissed Wappler's case with prejudice. The court also noted that it had dismissed all claims against Ivey and the officers in their official capacities.

First, the district court found that, as to his allegations against Ivey, Wappler's complaints concerned "nothing more than *de minimis* inconveniences that d[id] not constitute 'punishment' or otherwise rise to the level of constitutional violations." The district court further made the following findings: as to Wappler's allegations about triple bunking, mere overcrowding of a jail did not violate the Fourteenth Amendment; Wappler did not show that the crowded conditions at the jail were maintained arbitrarily or purposelessly, and he presented no credible evidence from which an inference could fairly be drawn; Wappler failed to provide evidence to establish that the overcrowding led to deprivations of essential food, medical care, or sanitation, or increased violence among inmates or other conditions intolerable for confinement; Wappler failed to demonstrate a violation of his constitutional rights regarding the alleged noisy conditions of the jail because he provided no evidence that his hearing loss was caused by such conditions, and

the noisy conditions he alleged were not beyond what would be expected of a typical prison environment; as to his alleged toenail fungal infection, Wappler provided no evidence about the extent of the injury or whether it was caused by the conditions of the jail; and he failed to show that he was denied life necessities or that he suffered unnecessary and wanton infliction of pain, and thus he did not have a viable Eighth Amendment claim.

The district court also found that even if Wappler's allegations against Ivey could create a genuine issue of material fact as to whether Wappler suffered a violation of his constitutional rights, Ivey was entitled to qualified immunity and entitled to summary judgment because Wappler had not shown that any of Ivey's conduct was objectively unreasonable.

Second, as to Wappler's allegations against the County, the district court found that Wappler could not establish that his constitutional rights were violated, which "alone mean[t] that his claims against [the County] fail[ed]." It explained that, while Wappler alleged that the County had a policy or custom of underfunding the jail, Wappler presented no evidence to show that the alleged constitutional violations were a highly predictable consequence of the County's failure to budget and adequately staff the jail. It also found that Wappler presented no evidence that the jail was underfunded to an extent that exhibited deliberate indifference to the jail's safety and security or that the alleged problems could have been resolved with additional funding. It further found that Wappler failed to prove causation by demonstrating that the

County's deliberate conduct was the moving force behind his alleged injuries, and thus the County was entitled to summary judgment.

Third, the district court found that as to Wappler's retaliation claim against the officers, Wappler suffered adverse action in the form of disciplinary confinement because he violated the prison rules, not because of his earlier grievances. It found that his retaliation claim failed because he was guilty of the charges resulting in the disciplinary harm at issue, and he was afforded adequate due process at the disciplinary hearings. It found that even if Wappler could show that the officers were subjectively motivated to discipline him because of his grievances, the record showed that the officers would have taken the same disciplinary actions in the absence of his protected activity because he was found guilty of the disciplinary charges. It found that Wappler provided "nothing factual to suggest a causal connection between the protected activity and the harm," but only offered his own conclusory allegations, and therefore the officers were entitled to summary judgment.

Lastly, the district court also found that as to Ivey's counterclaim, Wappler "ha[d] not disputed this matter," and thus Ivey was entitled to summary judgment in the amount of $91,250, which was the total amount of the damages and losses for Wappler's incarceration costs and other correctional costs.

Wappler timely appealed.

## II.  STANDARD OF REVIEW

We review the grant of a summary judgment motion de novo. *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012). We "may affirm the judgment of the district court on any ground supported by the record, regardless of whether that ground was relied upon or even considered by the district court." *Id.* at 1309.

Summary judgment is appropriate when the record evidence shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Mosley,* 694 F.3d at 1300. At summary judgment, although the district court must draw all reasonable inferences in favor of the nonmoving party, "inferences based upon speculation are not reasonable." *Mosley,* 694 F.3d at 1301 (quoting *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986)). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.'" *Id.* at 1300 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Although we construe *pro se* pleadings liberally, "a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." *Brown v. Crawford,* 906 F.2d 667, 670 (11th Cir. 1990). The nonmoving party may not rely solely on the pleadings to defeat a motion for summary judgment, but must rely on "affidavits, depositions, answers to interrogatories, and admissions [to] show that there are

specific facts demonstrating that there is a genuine issue for trial." *Id.* Further, "[a] mere scintilla of evidence in support of the non-moving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004).

A party abandons an issue when he fails to raise it plainly and prominently on appeal. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014); *see also Irwin v. Hawk*, 40 F.3d 347, 347 n.1 (11th Cir. 1994) (applying the same to a *pro se* litigant). Simply stating that an issue exists, without providing reasoning and citation to authority on which the appellant relies, precludes our consideration of that issue on appeal. *Sapuppo*, 739 F.3d at 681.

### III.    ANALYSIS

On appeal, Wappler argues that the district court erred by: (1) granting summary judgment for the defendants because the court found that the conditions of Wappler's confinement did not violate his constitutional rights; (2) granting summary judgment for the defendants on Wappler's due process and retaliation claims because the court found that jail officials did not engage in retaliatory conduct and Wappler's due process rights were not violated; (3) granting summary judgment in favor of the sheriff in his official capacity on the sheriff's counterclaim for liquidated damages because the court found that Wappler did not dispute the counterclaim; and (4) denying Wappler's motion for leave to file a second amended complaint. We address each of his arguments in turn.

### A.    Wappler's Conditions-of-Confinement Claims

As an initial matter, Wappler has abandoned his claim on the conditions of his confinement because he fails to raise the issue plainly and prominently on appeal, and instead, he generally reasserts the allegations from his amended complaint. *Sapuppo*, 739 F.3d at 681; *Irwin*, 40 F.3d at 347 n.1. Nonetheless, we conclude that the district court did not err by granting summary judgment on Wappler's conditions-of-confinement claims in favor of Ivey and the County because the conditions of Wappler's confinement did not violate his Fourteenth Amendment rights.

"[T]o prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).

"[C]onditions under which a pretrial detainee [is] held are reviewed under the Due Process Clause of the Fourteenth Amendment." *Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1344 (11th Cir. 2016). "[I]n regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the [E]ighth amendment for convicted persons." *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1574 (11th Cir. 1985). The restrictions and conditions of detention may not amount to punishment or otherwise violate the Constitution. *Jacoby*, 835 F.3d at 1344–45. But "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). "[T]he fact that such detention interferes with

the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" *Id.*

"Whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose." *Jacoby*, 835 F.3d at 1345 (alterations adopted) (quoting *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004)). "An expressed intent to punish on the part of detention facility officials is sufficient, but not necessary, to establish unconstitutional pretrial punishment." *Id.* (alterations adopted) (quoting *Bell*, 441 U.S. at 538). "A court also permissibly may infer that the purpose of the governmental action is punishment" if the "restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless." *Id.* (alterations adopted) (quoting *Bell*, 441 U.S. at 539).

"In assessing claims of unconstitutionally overcrowded jails, courts must consider the impact of the alleged overpopulation on the jail's ability to provide such necessities as food, medical care, and sanitation." *Hamm*, 774 F.2d at 1575. "'[D]ouble-bunking' (placing two inmates in a cell intended for one) does not constitute punishment." *Jacoby*, 835 F.3d at 1345 (quoting *Bell*, 441 U.S. at 540-43). In concluding in *Bell* that double-bunking did not amount to punishment, the Supreme Court considered the following factors: (1) the detainees only had to spend about seven or eight hours a

day in their room, during most or all of which they were presumably sleeping; (2) the cells provided adequate space for sleeping; (3) the detainees were otherwise free to move between their rooms and the common area; and (4) nearly all detainees were released within 60 days.  *Bell*, 441 U.S. at 543.  "The fact that [a detainee] temporarily had to sleep upon a mattress on the floor or on a table is not necessarily a constitutional violation."  *Hamm*, 774 F.2d at 1575.

"The Constitution requires that prisoners be provided reasonably adequate food," and "[a] well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required."  *Id.* (quoting *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977)).  "The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."  *Id.*  Prison officials must also "take reasonable measures to guarantee the safety of the inmates," such as protecting prisoners "from violence at the hands of other prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

Additionally, "[t]he Eighth Amendment—and therefore the Fourteenth—is violated when a jailer is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury."  *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020) (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)).

"To establish a deliberate-indifference claim, a plaintiff must make both an objective and a subjective showing."  *Id.*  "Under the objective component, the plaintiff must demonstrate a substantial

risk of serious harm." *Id.* "Under the subjective component, the plaintiff must prove the defendants' deliberate indifference to that risk of harm by making three sub-showings: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id.* (quoting *Lane*, 835 F.3d at 1308). "The deliberate-indifference standard sets an appropriately high bar," and "[a] plaintiff must prove that the defendant acted with "a sufficiently culpable state of mind." *Id.* (quoting *Farmer*, 511 U.S. at 834)). Moreover, to prevail against prison officials in their individual capacities, the plaintiff must show that they were personally involved in acts or omissions that resulted in the constitutional deprivation. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995).

"When an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). "Such suits against municipal officers are therefore, in actuality, suits directly against [the county] that the officer represents." *See id.*; *see also Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1302 n.3 (11th Cir. 2005).

"[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283,

1289 (11th Cir. 2004). "It is only when the execution of the government's policy or custom inflects the injury that the municipality may be held liable." *Id.* A plaintiff has "two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). The plaintiff must also show that "the county's custom or practice is the moving force behind the constitutional violation." *Id.*

First, the district court properly found that the conditions of Wappler's confinement did not amount to punishment or otherwise amount to a constitutional violation. *See Jacoby*, 835 F.3d at 1344–45. As to his claim that he was not provided utensils to eat his food while he was in the bubble, he denied that any physical injury resulted from eating without utensils. Wappler also failed to provide evidence to establish that he was deprived of utensils for a punitive purpose, or that the lack of utensils led to sanitation issues that caused him an injury. And he did not otherwise present evidence that he was deprived of reasonably adequate meals, which is all that is required of the jail, so the fact that meals were served without utensils did not alone amount to a constitutional violation. *See Hamm*, 774 F.2d at 1575; *Crawford*, 906 F.2d at 670; *Mosley,* 694 F.3d at 1301. Turning to Wappler's claim that he was housed with convicted inmates while he was at the jail, he testified that he did not endure violence from being housed with such inmates, and thus the fact that he was housed with convicted inmates

did not amount to a constitutional violation. *See Farmer*, 511 U.S. at 833.

Wappler also claimed that triple-bunking was a constitutional violation, but the Supreme Court has held that placing two detainees in a cell intended for one was not a constitutional violation, and Wappler did not provide evidence that the cell in which he was housed was intended for one detainee rather than two or three. *See Jacoby*, 835 F.3d at 1345; *Bell*, 441 U.S. at 543; *Crawford*, 906 F.2d at 670; *Mosley,* 694 F.3d at 1301. And though he was in the triple-bunk cell for longer than 60 days, Wappler did not provide evidence that the cell lacked adequate space for sleeping, and he testified that, on occasions, there would be two people rather than three people housed in the cell and that he was allowed to spend 13 hours of the day in the day room. *See Bell*, 441 U.S. at 543; *Crawford*, 906 F.2d at 670; *Mosley,* 694 F.3d at 1301.

As to Wappler's claim that the jail was unsanitary, he testified that the jail was regularly cleaned, and each week he was provided some cleaning supplies. Thus, the alleged unsanitary conditions of the jail did not amount to a constitutional violation. *See Jacoby*, 835 F.3d at 1345; *Bell*, 441 U.S. at 537. Wappler also claims that the jail was too noisy, particularly because of the screaming, hollering, and doors slamming. Wappler said that he suffered severe hearing loss, but he provided no evidence whatsoever regarding when this hearing loss occurred or that any hearing damage was caused by the noise at the jail. Ultimately, Wappler points to no evidence to suggest that the conditions he described were

atypical for a jail environment nor any evidence showing that noisy conditions caused him any harm. *See Jacoby*, 835 F.3d at 1345; *Bell*, 441 U.S. at 537.

As for Wappler's claim that the jail was overcrowded, he did not present evidence that the jail's supposed overpopulation impacted the jail's ability to provide such necessities as food, medical care, and sanitation. *See Jacoby*, 835 F.3d at 1345; *Bell*, 441 U.S. at 537; *Crawford*, 906 F.2d at 670; *Mosley,* 694 F.3d at 1301. As to his other claims about the lack of comforts—including socks, his preferred shoes, fresh air, blankets—violating his constitutional rights, the fact that detention interfered with his desire to live as comfortably as he would have liked did not convert the jail's conditions or restrictions of detention into punishment. *See Bell*, 441 U.S. at 537. Moreover, he did not present evidence that any of the conditions of confinement were arbitrary or purposeless. *See Jacoby*, 835 F.3d at 1345; *Crawford*, 906 F.2d at 670; *Mosley,* 694 F.3d at 1301. We, therefore, agree with the district court that the conditions of Wappler's confinement did not amount to punishment or otherwise amount to a constitutional violation.

Turning to Wappler's claims against Sheriff Ivey, the district court properly found that no genuine issue of material fact existed. Even assuming that Wappler established that he faced substantial risks of harm, including his alleged toe fungus, hearing loss, anxiety, sleep disturbance, and emotional distress, he did not present evidence that Ivey had subjective knowledge of such risks to his health and safety so as to constitute deliberate indifference. *See*

*Swain*, 961 F.3d at 1285; *Crawford*, 906 F.2d at 670; *Mosley,* 694 F.3d at 1301. In fact, Wappler did not present evidence that Ivey was personally involved in any act or omission that resulted in his alleged constitutional deprivations. *See Hale*, 50 F.3d at 1582; *Crawford*, 906 F.2d at 670; *Mosley,* 694 F.3d at 1301. Thus, Ivey was entitled to summary judgment.

Lastly, the district court properly found that no genuine issue of material fact existed as to Wappler's claims against the County. *Mosley,* 694 F.3d at 1300; *McDowell*, 392 F.3d at 1289. Because he suffered no constitutional deprivation, his claim against the County necessarily failed. *See McDowell*, 392 F.3d at 1289. And even if a constitutional deprivation existed, to the extent that Wappler asserted that the County had a practice of underfunding the jail, he did not provide evidence that such a budgeting practice was either an officially promulgated county policy or an unofficial custom or a practice of the County established through the repeated acts of a final policymaker. *Grech., 335* F.3d at 1329; *Crawford*, 906 F.2d at 670; *Mosley,* 694 F.3d at 1301. Wappler did not provide evidence that such a budgeting practice was the moving force behind any alleged constitutional violation, and, other than his conclusory allegations, he did not otherwise provide evidence of any other policy or custom that satisfied the requirements under *McDowell* and *Grech* to prevail on his claims against the County. *McDowell*, 392 F.3d at 1289; *Grech, 335* F.3d at 1329; *Crawford*, 906 F.2d at 670; *Mosley,* 694 F.3d at 1301. Thus, the County was entitled to summary judgment.

In sum, the district court properly granted summary judgment on Wappler's conditions-of-confinement claims against Ivey and the County because the evidence showed that the conditions of his confinement did not amount to punishment or otherwise amount to a constitutional violation.  Wappler also failed to present evidence showing that Ivey was personally involved in any act or omission that led to his alleged constitutional deprivations, nor did he present evidence that the County had any policy, custom, or practice that was the moving force behind his alleged constitutional violations.  Accordingly, Ivey and the County were entitled to summary judgment on these claims.

### B.    Wappler's Retaliation and Due Process Claims

Like his conditions-of-confinement claim, Wappler has also arguably abandoned his due process and retaliation claims because he fails to raise those issues plainly and prominently on appeal and similarly resorts to generally reasserting the allegations in his amended complaint. *Sapuppo*, 739 F.3d at 681; *Irwin*, 40 F.3d at 347 n.1.  In any event, Wappler's claims also fail on the merits.

"To establish a retaliation claim, a prisoner must demonstrate 'that the prison official's actions were the result of his having filed a grievance concerning the conditions of his imprisonment.'" *Williams v. Radford*, 64 F.4th 1185, 1192 (11th Cir. 2023) (quoting *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003)).  A plaintiff can prevail on a retaliation claim if "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of

ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Id.* (quoting *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008)).

In evaluating whether the plaintiff established causation, we ask whether the defendant was "subjectively motivated" to discipline the plaintiff for exercising his First Amendment rights. *Id.* at 1193. We have held that "any possible causal connection between the protected activity (the grievances) and the harm (the disciplinary charges and sanctions) is severed [when] the harm is not in reaction to any protected activity, but directly due to an improper activity." *O'Bryant v. Finch*, 637 F.3d 1207, 1219–20 (11th Cir. 2011). If the defendant can show that he would have "taken the same disciplinary actions in the absence of [the] protected activity," he is entitled to summary judgment. *Id.* at 1217, 1219.

Additionally, "[w]here a constitutionally protected liberty interest exists . . . a prison must give an inmate: (1) advance written notice of the charges; (2) a written statement of the reasons for the disciplinary action taken; and (3) the opportunity to call witnesses and present evidence when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Jacoby*, 835 F.3d at 1350 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 564-66 (1974)).

Here, we conclude that the district court did not err by granting summary judgment on Wappler's due process and retaliation claims. First, Wappler's due process rights were not violated

because he was provided with advance written notices of the charges; he was provided with the incident reports, which he signed in acknowledgment, affirming that he understood the nature of the charges against him and the disciplinary actions that were taken; and he had the opportunity to call witnesses and present evidence. *See Jacoby*, 835 F.3d at 1350. Second, the jail officials did not engage in retaliatory conduct because the record showed that the disciplinary actions were direct reactions to Wappler's misconduct, not because of any alleged prior protected activity. *See Williams*, 64 F.4th at 1192–93; *O'Bryant*, 637 F.3d at 1217, 1219–20. Wappler presented no evidence to show otherwise. And the officers stated in their affidavits—against which Wappler offers no competing evidence—that they would have taken the same disciplinary actions absent any alleged prior protected activity. *See O'Bryant*, 637 F.3d at 1217, 1219. Accordingly, the jail officials were entitled to summary judgment on these claims, and we affirm as to this issue.

## C.    Sheriff Ivey's Counterclaim

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

In *United States v. One Piece of Property, 5800 S.W. 4th Ave., Miami, Florida,* 363 F.3d 1099 (11th Cir. 2004), we held that

"[s]ummary judgment [would be] appropriate where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Id*. at 1101 (citing Fed. R. Civ. P. 56(c)).  Therefore, "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *Id*.  Additionally, "so that there can be an effective review of the case on appeal, the district court's order granting summary judgment must 'indicate that the merits of the motion were addressed.'" *Id*. at 1102 (quoting *Dunlap v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir. 1988)).  After so holding, we noted that we need not decide whether the district court granted summary judgment without considering the merits of the motion because a "review of the record convince[d] us that there [was] a genuine issue of material fact that made summary judgment inappropriate." *Id*. at 1102 n.2.

We have also vacated the district court's judgment, without concluding whether the record revealed a genuine issue of material fact, when it was "apparent that the district court did not examine the merits of [the] case, but instead granted summary judgment by default merely because it believed [that the opposing party] had filed no response." *Trs. of Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1040 (11th Cir. 2004).

Under Florida law, "[u]pon conviction, a convicted offender is liable to the state and its local subdivisions for damages and losses for incarceration costs and other correctional costs," and a "local subdivision of" the state can petition for a civil restitution lien to recover those costs. Fla. Stat. § 960.292(1)-(2). If "the conviction is for an offense other than a capital or life felony, a liquidated damage amount of $50 per day of the convicted offender's sentence shall be assessed against the convicted offender and in favor of the state or its local subdivisions." *Id.* § 960.293(2)(b). The state and its local subdivisions, in a separate civil action or as counterclaim in any civil action, may seek recovery of such damages and losses. *Id.* § 960.297(1).

Here, we conclude that the district court erred by granting summary judgment on Ivey's counterclaim because it was apparent that the court did not consider the merits of the counterclaim and based its judgment on the belief that Wappler did not dispute the counterclaim. *Wolf Crane Serv.,* 374 F.3d at 1040. Though we have vacated judgments on this basis alone, we have also reviewed the record to determine whether a genuine issue of material fact exists when a district court enters judgment without considering the merits. *See Wolf Crane Serv.,* 374 F.3d at 1040; *One Piece of Property*, 363 F.3d at 1101–02, 1102 n.2.

Based on a review of the record here, had the district court indicated that it considered the merits of the counterclaim, it appears that the court still may have erred by granting summary judgment on the counterclaim for the total amount of $91,250. *See One*

*Piece of Property*, 363 F.3d at 1101–02, 1102 n.2.  Though Wappler was sentenced to a total of 60 months' imprisonment for his convictions, the record showed that he only spent about 17 months and 3 weeks at the jail.  Section 960.293(2) does not limit costs to those incurred after conviction, and thus a convicted offender could be liable for costs related to his pretrial detention.  In such a scenario, however, the sheriff would be entitled only to an amount determined by how many days the plaintiff was actually detained in the jail.  *See* Fla. Stat. §§ 960.292(1)-(2), 960.293(2)(b), 960.297(1).  This approach makes sense because the evident purpose of the relevant Florida statutes is to reimburse the government for costs of incarceration—which must, in all fairness, be actual and not hypothetical.  Thus, Ivey would be entitled to an amount calculated based on the 17 months and 3 weeks that Wappler had been housed at the jail, not the amount calculated based on his total sentence upon conviction.  *See* Fla. Stat. §§ 960.292(1)-(2), 960.293(2)(b), 960.297(1).

We thus conclude that the district court erred by granting summary judgment on the sheriff's counterclaim because the district court did not consider the merits of the counterclaim and based its judgment, instead, on the belief that Wappler did not dispute the counterclaim.  *Wolf Crane Serv.,* 374 F.3d at 1040.  We therefore vacate and remand as to this issue.

### D.     Wappler's Motion to File a Second Amended Complaint

Finally, we turn to the district court's denial of leave for Wappler to file a second amended complaint. We review the denial of a motion to amend a complaint for an abuse of discretion. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1319 (11th Cir. 1999). When "the denial is based on a legal determination that amendment would be futile," we review such decisions *de novo*. *Taveras v. Bank of Am., N.A.*, 89 F.4th 1279, 1285 (11th Cir. 2024) (quoting *Gonzalez v. City of Deerfield Beach*, 549 F.3d 1331, 1332–33 (11th Cir. 2008)).

After the time for amending as a matter of course has passed, amendments are permissible only with the opposing party's written consent or the court's leave, which the court "should freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). A district court may deny such leave where (1) there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) allowing amendment would cause undue prejudice to the opposing party; or (3) amendment would be futile. *Weaver*, 169 F.3d at 1319. When the complaint as amended would still be dismissed, the district court may properly deny a motion for leave to amend as futile. *Taveras*, 89 F.4th at 1289.

We have previously held that there was "no good reason" for a belated amended complaint when the operative facts supporting new claims were known to the plaintiff when the case was originally filed, and the failure to include the new claims at the outset was "not explained." *Maynard v. Bd. of Regents of Div. of Universities*

*of Fla. Dep't of Educ.*, 342 F.3d 1281, 1287 (11th Cir. 2003). In such a situation, the district court does not abuse its discretion by denying the plaintiff's motion to amend his complaint. *See id.*

Here, we conclude that the district court did not err by denying Wappler's motion for leave to file a second amended complaint because Wappler demonstrated no good reason as to why he could not have filed his motion earlier and the amendments that he requested to add to his existing claims were futile. *Weaver*, 169 F.3d at 1319; *Taveras*, 89 F.4th at 1289.

## IV.    CONCLUSION

For these reasons, we affirm: (1) the district court's entry of summary judgment in favor of the defendants on Wappler's conditions-of-confinement claim, (2) the district court's entry of summary judgment in favor of the defendants on Wappler's due process and retaliation claims, and (3) the district court's denial of Wappler's motion to file a second amended complaint. As to the district court's entry of summary judgment on the sheriff's counterclaim, we vacate and remand to the district court for further proceedings.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**