**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-13131

_____

PAMELA SMOTHERS,
  as administrator and personal representative of the Estate
  MITCHELL WAYNE SMOTHERS JR, deceased,

                                                    *Plaintiff-Appellant,*

*versus*

ROGER CHILDERS, et al.,

                                                              *Defendants,*

WALKER COUNTY,

                                                    *Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 6:21-cv-01057-RDP

_____

Before ROSENBAUM, GRANT, and BRASHER, Circuit Judges.

ROSENBAUM, CIRCUIT JUDGE:

Pamela Smothers's son, Mitchell Wayne Smothers Junior, was incarcerated for failure to report to his probation officer.[1] About six months later, he tragically died while in Walker County Jail's ("Jail") custody.  Smothers asserts that her son died of septic shock because the Jail failed to provide adequate healthcare.  And the Jail offered substandard care, she contends, because Walker County adopted a policy of contracting with a private company, Preemptive Forensic Health Solutions ("Preemptive"), to provide all medical care to inmates, even though Preemptive employed no physicians and was incompetent.

To make matters worse, Smothers alleges, in the sheriff's election before Mitchell's death, the Jail's poor medical care was at issue.  After all, by that point, several inmates had died on Preemptive's watch.  So once the sheriff won election, he asked the county to fire Preemptive.  But the county wouldn't let him.  Instead, Walker County continued to employ Preemptive.  Then it doubled down and renewed Preemptive's contract.

Based on this conduct, Smothers, as the administrator of her son's estate, brought an action against the county under 42 U.S.C. § 1983 ("Section 1983").[2]  She sought damages for the county's

---

[1] For ease of reading, we'll refer to the plaintiff-appellant Pamela Smothers as "Smothers" throughout.  And we'll refer to her son, Mitchell Wayne Smothers, Junior, as "Mitchell."

[2] Smothers also sued Preemptive and its owner, but she settled with them.

deliberate indifference to her son's constitutional right to adequate healthcare while he was incarcerated.

The county sought summary judgment, and the district court granted it. As the basis, the court held that Alabama law contains a statutory bar to Section 1983 liability for Walker County.

We respectfully disagree. Under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690–691 (1978), Smothers has identified enough evidence for a jury to conclude that the county had a policy that directly resulted in the deprivation of Mitchell's Eighth Amendment right to receive necessary medical care. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.") (internal citation omitted).

To be sure, as the district court noted, Alabama law places the responsibility for administering healthcare in prisons on the sheriff.[3] But Smothers presents evidence that would allow a reasonable jury to conclude that the county took it upon itself to knowingly contract with an incompetent healthcare provider to exclusively provide the Jail's medical care. Then, when inmates began dying as a result, the county prevented the sheriff from remedying the problem. Or in more colloquial terms and to paraphrase

---

[3] *See* Ala. Code § 14-6-19 (1975).

the so-called Pottery Barn rule,[4] a reasonable jury could find that the county adopted and knowingly doubled down on a policy that broke the Jail's healthcare, so now the county owns the Jail's healthcare. And because a reasonable jury could also determine that the county's alleged policy resulted in Mitchell's death, Smothers has plausibly asserted that the county violated Mitchell's Eighth Amendment right to be free from deliberate indifference to his medical needs.

As a result, no state-law barrier exists to holding Walker County liable for its policy. So we reverse and remand for further proceedings.

## I.        BACKGROUND

We are reviewing an order on a motion for summary judgment. For that reason, we recite the evidence in the light most favorable to Smothers, the non-moving party, and we draw all reasonable inferences from that evidence in Smothers's favor.[5] *See*

---

[4] The "Pottery Barn rule" refers to the notion that if "'[y]ou break it, you own it.'" James Warren, *On Donald Trump and the "Pottery Barn Rule"*, Vanity Fair, Nov. 21, 2016 [Perma | On Donald Trump and the "Pottery Barn Rule" | Vanity Fair]. As it turns out, though, the rule is not Pottery Barn's policy. *Id.* Rather, Pottery Barn's corporate policy provides "that if you break it accidentally, then you don't have to pay for it." *Id.* The phrase "the Pottery Barn rule" has been attributed to Tom Friedman of *The New York Times*. *Id.* As we explain below, Smothers presented evidence that would allow a reasonable jury to find that the county both broke and bought (both literally and figuratively) the Jail's medical care.

[5] Because we present the evidence in the light most favorable to the non-movant (here, Smothers), the actual facts may or may not be as alleged.

*State Farm Mut. Auto. Ins. Co. v. Spangler*, 64 F.4th 1173, 1178 (11th Cir. 2023).

We begin with a review of the healthcare set-up at the Walker County Jail. Then we explain how Smothers's son fits into the picture.

In 2009, Walker County contracted with Preemptive Forensic Health Solutions, an outside company, to provide comprehensive onsite medical services for Walker County Jail detainees. Preemptive's President and owner Roger Childers is a registered nurse. Childers holds a Ph.D. in Business Administration but not an M.D.

The initial Contract for Services between the county and Preemptive established that the county would pay the company $168,000 each year for its medical care. At the time, Preemptive was the lowest-cost provider that submitted a bid to the county.

Soon, it became clear that Preemptive wasn't upholding its end of the bargain. Childers referred to himself and signed communications as "Dr. Childers," even though he isn't a medical doctor. And he provided far fewer services over the contracting period than the county had used previously. For example, Childers boasted of more than $700,000 in medication "savings" for the county over the six-year period from 2009 to 2015. Childers gathered these "savings" by dispensing far less medication than prior medical providers had to inmates.

Childers also drastically cut how many inmates received outside medical care. Before Preemptive took over the Jail's

healthcare, in the single month of September 2009 alone, thirty-three detainees were sent to outside medical providers. In contrast, over the six years from 2009 to 2015, Childers sent fewer than twelve detainees to offsite services. That is, Childers provided outside medical care at a rate of almost 200 times less than the Jail previously had.

To explain the disparity, Childers told the county that either a physician, "and[/]or" a dentist or an advanced-practice nurse, provided services to detainees "monthly." Yet the contract at the time required that a physician, dentist, or advanced-practice nurse visit the Jail's clinic at least once "*per week*" (emphasis added).

All told, after Preemptive's contract went into effect, eleven people incarcerated at the Jail died.

During this period, the county received complaints that the deaths resulted from a lack of necessary and adequate medical care. But the county still renewed Preemptive's contract in 2012 and again in 2016.

In September 2015, Childers wrote to the County Commission. He touted the care and savings he said he'd provided, bragging that he'd cut costs and transferred fewer detainees out of the Jail for medical visits. And indeed, these changes were quite drastic. For example, the Jail used to pay $13,000 per month for medication. But in 2015, those costs went down to about one-sixth of what they had been—to $2,200 per month.

Perhaps in response to the complaints about the medical care at the Jail, the county changed a few provisions in its 2016

contract with Preemptive. That contract required Preemptive to provide "basic *and adequate* medical care, treatment(s) and service(s) to the County inmates" (emphasis added). As compared to the 2012 contract, the "and adequate" part was new. And the 2012 contract also required more than its predecessor. Under the 2012 contract, Childers's "medical team" had to be "properly licensed and credentialed," while the previous contract didn't include that express qualification.

The 2016 contract also limited who could address problems in Preemptive's performance. That contract described the procedure for giving notice and curing deficiencies as addressable "in the *sole discretion* of the County" (rather than, as in the 2012 contract, "in the *opinion* of the 'County'" (emphases added). It said, "If, in the sole discretion of the County, [Preemptive] is not in compliance with the terms and obligations set forth above . . . , then the County shall give [Preemptive] at least sixty (60) days notice to correct any alleged deficiency and said notice shall notify [Preemptive] in writing of the specific complaint of non-compliance."

In turn, the contract defined "County" as "the Walker County Commission, Sheriff James Underwood, *and* the Walker County Sheriff's Department, . . . collectively" (emphasis added).[6] The evidence suggests that this definition meant that, to take corrective action, the sheriff and County Commission had to *together*

---

[6] Childers, as the President of Preemptive; Billy R. Luster, as Chair of the Walker County Commission; and James Underwood, as Sheriff of the Walker County Sheriff's Department, executed the contract.

agree to notice and cure any of Preemptive's noncompliance with the contract. Neither the sheriff nor the county believed that the sheriff had any authority to cancel the contract on his own. Indeed, the sheriff testified that he wasn't "aware of" having any authority to modify, cancel, or renew the contract with the Company. And the County Administrator agreed that "in 2019 or 2020, Sheriff [Nick] Smith didn't have the authority to hire on his own accord a new medical provider for inmate health services," and that "[i]n other words, the County"—specifically, the County Commission—"had to be involved with that decision."

Between 2016 and September 2018, under Preemptive's reign, the costs for medical services at the jail remained roughly constant. Then, when the 2016 Contract for Services between the county and Preemptive expired in September 2018, the county continued the contract on a month-to-month basis. As a result, the terms of the 2016 contract generally remained in place, though the county agreed to provide extra hours for medical care at the Jail. To compensate for these increased hours, the county upped the monthly pay to Preemptive from $17,327 to $19,063.34 per month

Around this time, then-candidate Nick Smith was campaigning for the 2018 election for sheriff. He campaigned in part on challenging the low quality of medical care that Preemptive was providing at the Jail. But once Smith was elected in January 2019, under the contractual terms, he lacked the authority to cancel the contract with Preemptive on his own. Yet the county still looked

to Sheriff Smith to administer the Preemptive contract, even though, by himself, he couldn't modify or repudiate it.

The sheriff repeatedly complained to the county about Preemptive. As the sheriff reported, Preemptive was providing only certified nursing assistants rather than nurses, and it wasn't offering proper medical treatment to Jail detainees, in violation of the contract.

The sheriff discussed his concerns with County Commissioner Chair Jerry Bishop. Bishop told Sheriff Smith they'd "address the contract and the bid after [Bishop's] election," which was then approaching.

Around July 2019, the sheriff couldn't take it anymore. He told his correctional officers at the Jail to send detainees straight to the hospital for medical care, rather than to Childers and Preemptive. Not only that, but the sheriff directed the officers to do this if anybody so much as "complained about their toe being stubbed." Sheriff Smith also instructed Childers to email him daily updates on "inmates [who] were vulnerable" and "needed medical attention[.]" Childers began to do so. After the sheriff implemented this policy, the Jail's healthcare costs doubled.

Although the county asked about the increased costs, it never told the sheriff to end his policy of sending detainees for outside medical care. Nor did the county ever refuse to pay a bill for outside care or reduce the money it allocated to the sheriff because of the sheriff's policy change. But, Sheriff Smith said, the county did say that it was "going to have to come up with that money from

somewhere and it could be taken out of [the sheriff's] budget." Still, the county also agreed to the sheriff's request to increase the daily time allocated for Jail medical care, from eight- to sixteen-hour days. But critically, the county didn't end its contract with Childers and Preemptive. Instead, it renewed the contract on a month-to-month basis and kept Childers and Preemptive on to provide for Jail detainees' medical needs.

That was the state of affairs at Walker County Jail in February 2019, when Mitchell found himself there because he failed to report to probation.[7] When he was booked, Mitchell was suffering from several serious health conditions. They included liver cirrhosis secondary to hepatitis C, alcoholism, chronic obstructive pulmonary disease, recurrent cellulitis, and nonhealing pressure wounds. A month earlier, a hospital had discharged him. He had been there for an MRSA infection in a large, open, and nonhealing wound on his leg.

Mitchell was in significant pain after his arrest. At his booking in mid-February, one of Preemptive's nurses at the Jail, Director of Nursing Amanda Getter Mize, assessed Mitchell. Mize admitted that she was aware of Mitchell's chronic health conditions, leg cellulitis, and antibiotics prescription. She knew he'd recently been hospitalized. Based on how Mitchell presented, Mize said the "standard protocol" would have been to put Mitchell's name on the list of detainees who needed to see a doctor. She also suggested

---

[7] Mitchell's underlying conviction was for one count of possessing a forged instrument in the fourth degree.

that she'd done so.  In Mize's opinion, Mitchell "needed to be seen by the physician" for follow-up care.

That put the ball in Childers's corner.  Childers bore responsibility for ensuring that physicians came in and saw detainees on the doctor's list.  But though Childers reviewed Mize's assessment, he never scheduled Mitchell to see a doctor.

Childers knew that Mitchell had an infected wound.  He also knew that, though Mitchell had "heal[ed] somewhat, . . . he did have nonhealing pressure wounds at the time."  Yet Childers couldn't identify *any* medical doctor involved in overseeing Smothers's care.  And though the record suggests that nurses at Preemptive changed the bandages on Mitchell's leg twice shortly after his booking, they appear to have discontinued any further wound care after that.

Meanwhile, Mitchell's health continued to deteriorate.  Mitchell told his mother that the Jail gave him only ibuprofen, even though, when he was arrested, he was taking antibiotics for the leg wound, as well as stomach medicine, a water pill, and antacids.  But Mitchell never complained to his mother that he requested any medication that Jail staff refused to provide or that he asked for a doctor and never saw one.

Even so, though, by May or June 2019, Mitchell told his mother that he was "passing pure blood and . . . could not stand on his own."  He said he had "[t]remendous stomach pain," which "progressively got worse," and bloody "[o]pen lesions on his legs[.]"

In May, Preemptive's nursing staff decided they had to move Mitchell back to booking for medical observation. But while Mitchell was there, no physician saw him. Nor did the nursing staff seem to do any assessments beyond simply taking Mitchell's vitals. Indeed, Childers wasn't aware that anyone had assessed Smothers's leg wound at that time. But that didn't stop Childers from ordering Mitchell returned to his assigned housing unit two days later—without giving Mitchell any meaningful care before sending him back.

By June, Preemptive still hadn't arranged for a doctor to see Mitchell. Instead, on their own, Preemptive's nurses evidently gave Mitchell Lasix (a prescription-only diuretic), anyway. And they did so even though they didn't have a valid doctor's prescription on file for the medication.

Dr. Michael McMunn, an expert witness, testified that Childers adversely affected Mitchell's health by giving him this medication without medical oversight from a doctor. In Dr. McMunn's view, a licensed physician would have been able to catch the issues with Mitchell's nonhealing infected wound. And Dr. McMunn continued, Childers's treatment didn't meet the standard of care for Alabama nurses, either. In fact, Dr. McMunn described Childers's behavior as "a particularly egregious violation of the standard of care," given how "clearly and visibly obvious" Mitchell's "serious medical needs" were at the time. Even fellow detainees apparently realized there was a problem.

The evidence suggests that this unlicensed prescription and Childers's dereliction of the standard of care weren't unusual. Rather, Preemptive regularly had Childers—a nurse—attempt to medically diagnose detainees and prescribe medication to them. And Preemptive's nurses consistently wrote prescriptions for medications under the name and DEA number of a doctor. But at least in Mitchell's case, that doctor never saw the patient or authorized his medications. In Dr. McMunn's view, this appeared to be a significant, recurring problem—with Preemptive staff violating "multiple" treatment guidelines and providing "substantially deficient" healthcare to detainees.

After months of failing to provide Mitchell with appropriate medical care, in late June, Childers asked the Jail's administrator to request that the Alabama Department of Corrections transfer Mitchell to their facilities. The administrator's resulting letter requested the transfer "ASAP," "due to the high medical risks [Mitchell posed] for us at the Walker County Jail."

But more than a month passed before the transfer happened. During that time, Preemptive never arranged for a doctor to see Mitchell. According to Childers, there was "no urgent reason to transport" Mitchell. But Childers also never actually assessed Mitchell's leg to know that.

So Mitchell's condition continued to deteriorate. On August 2, the on-duty jailers transferred Mitchell to a hospital because of the "swollen" condition of his legs and his "difficulty breathing." Once the hospital admitted Mitchell, doctors there diagnosed him

with acute metabolic encephalopathy, septic shock secondary to cellulitis, a urinary-tract infection, and hepatorenal syndrome.

Mitchell stayed there for a few days before the hospital discharged him to the Alabama Department of Corrections's Kilby Prison on August 6. Once Mitchell arrived, Kilby Prison officials declared him "nonresponsive," so they sent him back to a hospital. A few days later, on August 12, Mitchell suffered multisystem organ failure and died from septic shock.[8]

After Mitchell died, Smothers brought a deliberate-indifference claim under Section 1983, seeking damages for her son's untimely death. Smothers did so as the administrator and personal representative of her son's estate. She initially sued three named defendants: Childers, Preemptive, and Walker County. Smothers settled her claims with Childers and Preemptive, so only her claims against the county remained.

The county moved for summary judgment, and the district court granted the motion. In the county's view, the county couldn't have acted with deliberate indifference to Mitchell's death because it never owed Mitchell a duty to provide him with necessary and adequate medical care. The district court essentially agreed. It found that the county had a duty only to *fund* medical

---

[8] Some of the evidence in the record suggests that the cause of death was liver failure, while other evidence suggests that the "immediate cause" of Mitchell's death was septic shock. Viewing the evidence in the light most favorable to Smothers, we assume for summary-judgment purposes that Mitchell died from septic shock.

care, not to *provide* medical care, to people incarcerated in the Jail. And, the court concluded, the county had fulfilled that duty here.

Smothers timely appealed. She argues that the district court erred in finding that the county didn't owe a duty to provide detainees access to medical care. She also contends that the court erred in granting summary judgment in the county's favor on this record.

For the reasons we turn to now, we vacate the district court's grant of summary judgment and remand for further proceedings.

## II.    STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. In assessing the motion, we consider all evidence and make all reasonable inferences in favor of the non-moving party—here, Smothers. *State Farm*, 64 F.4th at 1178. A district court should grant summary judgment "only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). In other words, we can affirm a grant of summary judgment "only if a case is 'so one-sided that one party must prevail as a matter of law.'" *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1362 (11th Cir. 2018) (citation omitted). This case does not meet that standard.

## III.    DISCUSSION

As relevant here, 42 U.S.C. § 1983 imposes liability on "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State," violates "any rights, privileges, or immunities secured by the Constitution." In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978), the Supreme Court held that "municipalities and other local governmental bodies are 'persons' within the meaning of § 1983." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

But the text of § 1983 imposes liability on only those who "subject[] [a person], or cause[] [that person] to be subjected," to a loss of federal rights. *See id.* (discussing 42 U.S.C. § 1983). So it's not enough under *Monell* to hold a county liable merely because its employee violated rights. *Id.* Section 1983 doesn't authorize vicarious liability against a municipality.

Rather, a municipality can be liable in only three situations: first and second, "when execution of a government's [(a)] policy or [(b)] custom . . . inflicts the injury" the plaintiff suffered, *Monell*, 436 U.S. at 694, and third, when a municipal official "with final policymaking authority in the area of the act or decision" makes the challenged act or decision, *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 968 (11th Cir. 2002). We often refer to this as the "policy or custom" requirement.

Besides the policy or custom requirement, though, a litigant must show two other things. First, she must establish that the municipality undertook the challenged policy, custom, act, or decision "with the requisite degree of culpability." *Brown*, 520 U.S. at 404.

That is, *Monell* requires the county to have acted "with deliberate indifference to its known or obvious consequences." *McDowell*, 392 F.3d at 1291 (quoting *Davis ex rel. Doe v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1375–76 (11th Cir. 2000)).  And second, she must point to a "direct causal link between the municipal action and the deprivation of federal rights." *Id.*  So the plaintiff must show that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404.

Putting it all together, then, to establish a *Monell* claim under a custom or policy theory, Smothers must show "(1) that [Mitchell's] constitutional rights were violated; (2) that [the county] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

For a custom or policy theory to be actionable, the custom or policy must be "so well-settled and pervasive that it assumes the force of law;" it must be "persistent and widespread," so the county had either actual or constructive knowledge of it.  *Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1277 (11th Cir. 2000) (some citations and internal quotation marks omitted).  Put simply, the policy must, in fact, be a "policy." *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986).  So "[n]ormally[,] random acts or isolated incidents are insufficient to establish a custom or policy." *Id.*

And that makes sense.  As we've explained, "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop

it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991). The policy-or-custom requirement "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *McDowell*, 392 F.3d at 1290 (some citations and internal quotation marks omitted). It also "prevents the imposition of liability based upon an isolated incident." *Id.*

As for causation, we consider "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). We must scrutinize this link to avoid "collapsing" deliberate-indifference municipal liability under Section 1983 "into *respondeat superior* liability . . . ." *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

To show how this framework works in practice, we consider *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985). There, Anthony Ancata was pretrial detained at the Broward County Jail. *Id.* at 702. Prison Health Services provided medical services for the jail. But in response to his serious medical needs, Prison Health Services did nearly nothing to evaluate Ancata. *Id.* And they told Ancata that they wouldn't refer him to a non-staff specialist without a court order. *Id.* Not only that, but they refused to agree to a court order unless Ancata—who had been declared indigent—agreed to pay for his own medical evaluation. *Id.* So Ancata had to obtain court orders for both his first evaluation and

the necessary follow-up to that. *Id.* Soon after his evaluations, Ancata was hospitalized and died. *Id.*

Ancata's estate sued, among others, Broward County. *Id.* at 701. It alleged that Broward County had been deliberately indifferent to Ancata's Fourteenth Amendment right to adequate medical care when the county failed to provide adequate funding to address the medical needs of people in the jail.[9] *See id.*

We held that the estate had stated a claim. *See id.* at 704–05. We noted that Broward County was "responsible for insuring that adequate funds [were] provided to meet the medical needs of inmates." *Id.* at 705. And, we said, "[I]f Broward County established or utilized a policy or custom requiring that inmates needing medical assistance obtain court orders and the result of that policy or custom played a role in the delay in treatment and deliberate indifference shown towards Anthony Ancata, then the county may be liable." *Id.* at 705—06. Alternatively, we reasoned, "[I]f the county permitted the sheriff and/or prison health officials that it contracted with to establish such a policy or custom, it may also be

---

[9] Anthony Ancata was a pretrial detainee, not a convicted inmate. For that reason, the court in *Ancata* applied the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's prohibition against cruel and unusual punishment to evaluate his claim of deliberate indifference to serious medical needs. *See* 769 F.2d at 703 n.5. But as we explained in *Ancata*, this distinction made little practical difference because when it comes to the right against deliberate indifference to medical needs, the due-process rights for a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (citing *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239 (1983)).

liable." *Id.* at 706. That was so, we explained, because "[t]he liability would be a result of the county's own policy." *Id.*

Smothers's case does not materially differ from *Ancata*. At *Monell*'s first step, we must identify an official policy that could plausibly have caused the constitutional violation at issue. In *Ancata*, that policy required prisoners to obtain a court order before receiving necessary outside medical care. Here, Smothers has presented enough evidence for a reasonable jury to conclude that Walker County had a policy of contracting with Preemptive to provide the Jail's exclusive medical care, even though the county knew Preemptive was incompetent and offered inadequate care.

Indeed, Walker County knew that several detainees had died in Preemptive's care. And it received several credible complaints that they died because Preemptive failed to provide necessary and adequate medical care.

These deaths were not isolated incidents or anomalies, either. And the persistent poor quality (and lack) of medical care in the Jail was no secret. In 2018, Nick Smith ran for sheriff on it. He promised that he'd improve the Jail's medical care. But Walker County refused to allow Sheriff Smith to get rid of Preemptive once he won. And Sheriff Smith didn't have the contractual authority to end the contract with Preemptive on his own.

The county's deliberate decision to continue and then renew its contract with Preemptive under these circumstances, like Broward County's decision in *Ancata* to require its jail's prisoners to obtain court orders to receive necessary medical treatment, was

an official policy to knowingly provide inadequate medical care to the people in the Jail. Over several years, Walker County refused itself to rectify obvious deficiencies in the quality of care that inmates were receiving. Even worse, it rejected the sheriff's efforts to improve the medical care in the jails. This pervasive and longstanding course of conduct established a custom or policy for purposes of *Monell*.

Next, we consider the second step in the *Monell* analysis. *Monell* directs us to examine the culpability of the county. In *Ancata*, we noted that, by law, Broward County was "responsible for insuring that adequate funds [were] provided to meet the medical needs of inmates." *Ancata*, 769 F.2d at 705. And, we said, "Although Prison Health Services has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service." *Id.*

The case for Walker County's culpability here is more compelling than for Broward County's culpability in *Ancata*. Walker County decided to contract exclusively with Preemptive under a similar Alabama statute, even though it knew Preemptive was providing inadequate healthcare.

To be sure, as Walker County argues, unlike Florida law, Alabama law assigns the duty to provide "[n]ecessary medicines and medical attention" for jail inmates to the sheriff. *See* Ala. Code § 14-6-19. But § 14-6-20, Ala. Code, allows a county, if it so desires, to "elect a physician, or as many physicians as in its discretion may

be necessary, to attend the inmates of the jails in such counties . . . ."  This law also empowers counties to remove any such medical providers "at the will of the county commission." *Id*.  And Walker County entered into and renewed its contracts with Preemptive under this statute.

In doing so, a reasonable jury could conclude, the county acted with deliberate indifference to the "known or obvious consequences" of its policy of continuing to contract with Preemptive. *McDowell*, 392 F.3d at 1291.  Smothers presented ample evidence for a reasonable jury to find that that the county knew that Preemptive was providing inadequate medical care.  For starters, in the four years before Sheriff Smith took office, nine inmates died.

Besides that, Childers's own statements should have raised concerns with the county.  In a July 24, 2016, email, the county asked Childers how often a physician visits the Jail.  Childers responded, "[M]onthly."   But Preemptive's contract required "weekly" visits.  Childers also bragged in 2015 that Preemptive had cut the Jail's pharmaceutical budget by about five-sixths—from $13,000 per month to just $2,200.  In the same letter, Childers boasted that before Preemptive began its contract, the Jail had 33 transports to medical providers in a single month.  But in the *six years* of the contract, the Jail had a total of "less than 12."  On the flip side, Childers never explained how he had achieved these savings or the quality of care inmates were receiving as a result of Preemptive's fire sale on medications and doctor visits.

And then there's the evidence from Sheriff Smith. According to him, in 2017 and 2018, a public issue during the sheriff's campaign centered on complaints that "Childers wasn't an actual doctor, and then a number of people who had passed away while in custody at the Walker County Jail." And after Smith became the sheriff, he told the county commissioners "not to renew the contract with Preemptive" because Preemptive wasn't supplying adequate medical care. In fact, Smith complained to the county commissioners that he "hadn't laid eyes on any doctor" at the Jail.

Yet the county refused to part ways with Preemptive. And it had control over the contract with Preemptive. After asserting for itself the contractual "authority to control" Preemptive's compliance with its healthcare obligations, the county declined to enforce Preemptive's compliance. *See Turquitt v. Jefferson County*, 137 F.3d 1285, 1292 (11th Cir. 1998).

We have no trouble concluding that this evidence would allow a reasonable jury to find that the county reserved for itself the authority to change its policy of providing inadequate medical care to inmates. But the county refused to do so, in disregard of the obvious consequences—the deaths and other harms to inmates. This conduct satisfies the deliberate-indifference culpability standard.

Finally, as to the causation requirement, we explained in *Ancata* that Ancata's estate could establish causation by showing that "the result of [Broward County's policy requiring an inmate to obtain a court order for necessary outside medical evaluation] played

a role in the delay in treatment and deliberate indifference shown towards Anthony Ancata." *Ancata*, 769 F.2d at 705–06. Similarly, here, a reasonable jury could find that the county played a role in directly causing Mitchell's death through its custom or policy of maintaining its contract with Preemptive. When we view the evidence in the light most favorable to Smothers, Smothers has made a plausible showing that the county's deliberate indifference "was the moving force behind" Mitchell's death. *McDowell*, 392 F.3d at 1291 (quotation marks and citation omitted).

When Mitchell first arrived at the Walker County Jail, it was obvious to the healthcare staff at the Jail that he needed medical attention. Yet the Jail never provided adequate care. An expert witness testified that Preemptive's care for Mitchell fell well below the standard of care on a routine and recurring basis, and that lack of adequate care directly contributed to Mitchell's death. Based on this testimony and other evidence in the record, a reasonable jury could find "a direct causal link" between the county's policy or custom of continuing its contract with Preemptive "and the alleged constitutional deprivation," *City of Canton*, 489 U.S. at 385.

In short, Smothers presented enough evidence for a reasonable jury to conclude that the county was deliberately indifferent to Mitchell's Eighth Amendment rights. At the very least, the evidence is "in dispute, as to whether the [county] voluntarily undertook" a duty to provide medical care to Jail detainees, making "entry of summary judgment improper." *Dailey v. City of Birmingham*,

378 So. 2d 728, 729 (Ala. 1979).  So we vacate the district court's grant of summary judgment to the county.

Finally, as we alluded to earlier, we respectfully disagree with Walker County that Ala. Code 1975 § 14-6-19 somehow absolves it of liability here.  The district court pointed to that law to hold that Walker County could not be liable for Mitchell's death because "Alabama law imposes on Walker County only the duty to fund necessary medicine and medical attention to those prisoners who are sick or injured" and Walker County had fulfilled its duty to pay for medical care.  In reaching this conclusion, the district court also cited district-court opinions applying Alabama law that have limited a county's duties to fund medical care for inmates (citing *Shaw v. Coosa Cnty. Comm'n*, 330 F. Supp. 2d 1285, 1289 (M.D. Ala. 2004), and *Cole v. Walker County*, No. 6:14-CV-01671-JEO, 2015 WL 1733810, at *5 (N.D. Ala. Apr. 16, 2015)).

But neither § 14-6-19 nor the Alabama cases on which the district court relied abrogate a county's responsibility, under *Monell*, to refrain from establishing a policy that violates inmates' constitutional rights.  *See Monell*, 436 U.S. at 694.  In *Ancata,* we held that the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. at 97, means that a county can be liable under *Monell* for a Fourteenth Amendment violation if it "establishe[s] or utilize[s] a policy or custom" that results in "the delay in treatment and deliberate indifference shown towards" prison inmates.  *Ancata,* 769 F.2d at 706.  A county can also be liable for deliberate indifference if it "permit[s]

the sheriff and/or prison health officials that it contracted with to establish such a policy or custom." *Id.*

So the precise role that a state statute assigns to county officials in administering healthcare in a jail makes no difference. Rather, a county must not establish a policy that directly causes inmates to receive inadequate healthcare. But a reasonable jury could conclude that's what happened here. So we vacate the order of the district court granting summary judgment in favor of Walker County, and we remand for further proceedings.

## IV.    CONCLUSION

For the reasons we've explained, we conclude that the district court erred in finding that state law bars holding the county liable for the role its policy may have had in Mitchell's death. In other words, Walker County's policy of maintaining the contract with Preemptive can confer *Monell* and *Estelle*-based liability on the county. The general scope of counties' duties under Alabama law does not change this answer. And Smothers presented enough evidence for a reasonable jury to find in her favor. So we reverse the district court's grant of summary judgment for the county and remand for further proceedings.

**REVERSED and REMANDED.**